**V. Rachel LERCH, Plaintiff,**

v.

**CITIZENS FIRST BANCORP., INC., Defendant.**

**Harriette ROTH, et al., Plaintiff,**

v.

**Richard G. KELLEY, et al., Defendants.**

**Civ. A. No. 90–3538.**

United States District Court, D. New Jersey.

Aug. 11, 1992.

Lester L. Levy, Robert C. Finkel, Wolf Popper Ross Wolf & Jones, New York City, Peter S. Pearlman, Cohn Lifland Pearlman Herrmann & Knopf, Saddle Brook, N.J., for plaintiff V. Rachel Lerch.

Michael R. Cole, Alan E. Kraus, Jeffrey J. Miller, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, N.J., for defendants.

John J. Cahill, Walter W. Weber, Jr., Daniel M. Dwyer, Richard T. Garofalo, Wells, Garofalo, Jaworski & Liebman, Paramus, N.J., for defendant Richard G. Kelley.

Brian McDonough, Shanley & Fisher, P.C., New York City, for defendant Coopers & Lybrand.

Samuel Feldman, Laurence B. Orloff, Orloff, Lowenbach, Stifelman & Siegel, P.C., Roseland, N.J., for defendant Rodney T. Verblaauw.

James R. Van Horn, Sr. Vice President and Gen. Counsel, Citizens First Nat. of New Jersey, Glen Rock, N.J., for defendant Citizens First Bancorp, Inc.

Robert A. Fagella, Zazzali, Zazzali, Fagella & Nowak, Newark, N.J., for defendant Jack M. Blackin.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This matter involves allegations of securities fraud against a corporation and its outside auditor, and a vigorous argument by the defendant corporation and auditor that they, as well as other financial institutions, are being scapegoated for the current economic decline in the country. Defendants' argument takes the form of a motion to dismiss the complaint for failure to state a claim upon which relief can be granted, and for failure to plead fraud with the particularity required under Federal Rule 9.

For the following reasons, the motion is denied.

### I. Standard for Motion to dismiss

When assessing a motion to dismiss under Rule 12(b)(6), "the court must accept as true all factual allegations in the complaint and view them in a light most favorable to plaintiff." *DP Enterprises, Inc. v. Bucks County Community College*, 725 F.2d 943, 944 (3rd. Cir.1984); *Walck v. American Stock Exchange, Inc.*, 687 F.2d 778, 780 (3rd Cir.1982). The court may dismiss the complaint only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–56, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

### II. Background

Defendant Citizens First Bancorp, Inc. ("Citizens") is a financial corporation that conducts a general banking business through its subsidiary, Citizens First National Bank of New Jersey. Citizens' secu-

rities are registered with the Securities and Exchange Commission ("SEC") and its common and preferred stock are traded on the American Stock Exchange. Plaintiffs, who seek to represent a class of shareholders that invested in Citizens between December 1989 and August 1990 [1], essentially allege that defendants fraudulently misrepresented Citizens' financial situation, causing plaintiffs to invest in the company and suffer serious financial loss.

The saga, and class period, began on December 20, 1989, when Richard Kelley, Citizens' Chairman of the Board, announced that Citizens' dividends on common stock were increasing from $.60 per share to $.72 per share annually. Kelley assured potential shareholders that Citizens was experiencing a record year for profits. On January 17, 1990, Citizens announced that it had achieved a net income of $9,459,000, or $.44 a share, for the fourth quarter of the 1989 fiscal year. For the full fiscal year, Citizens reported a net income of $37,190,000, or $1.73 per share. This reflected an 18.2% increase over the equivalent time period in 1988. Nonetheless, on February 1, 1990, Citizens announced a plan to repurchase 500,000 shares of its own common stock on the open market, informing shareholders that the market price of Citizens stock was undervalued.

On March 30, 1990, Citizens filed with the Securities and Exchange Commission its Form 10–K and Annual Report for fiscal year 1989. Citizens disclosed that for each quarter of 1989, the number of nonperforming loans issued by Citizens had increased from 2.35% to 3.60% of its total outstanding loans. Still, Citizens announced that it had created provisions for loan losses of only $1,650,000 (an aggregate for the year of $6,600,000), a figure essentially unchanged from the previous year despite the increase of nonperforming loans. Citizens defended this decision by informing shareholders that "a substantial portion of these loans are collateralized by real estate, as well as by the personal guarantees of the principals." Citizens also informed shareholders of its internal procedures for setting the loan loss reserve [2]:

> The allowance for loan losses is generated through the charges to earnings. Loan losses (loans charged off net of recoveries) are charged against the allowance for loan losses. If, as a result of loans charged off or increases in the size or risk characteristics of the loan portfolio, the allowance is below the level considered by management to be adequate to absorb future loan losses, the provision for loan losses is increased to the level considered necessary to provide an adequate allowance.

Citizens went on to assure shareholders that "[a]s a result of the increase in nonperforming loans, it is possible that additional chargeoffs may occur in the future. However, management believes that the allowance for loan losses is sufficient to absorb these possible additional chargeoffs.... In the opinion of management, the allowance for loan losses is adequate to absorb both current and future losses."

The Annual Report for 1989 contained a Letter To Shareholders from Kelley and defendant Rodney T. Verblaauw, President and director of Citizens, detailing to investors the secure state of Citizens' loan loss reserves:

**REAL ESTATE LOANS ARE MANAGEABLE**

There has been a great deal of press coverage regarding nonperforming real estate loans in the nation and in New Jersey. At year-end, our nonperforming loans amounted to $77.7 million, up from $45.6 million at year-end 1988. Loan losses for 1989, net of recoveries, were $5.3 million, compared with $2.4 million in net losses in 1988. Although we are obviously not insulated from the problem, this total is at a manageable level. Each problem loan has been identified, and a plan has been implemented to work toward an orderly reduction of the debt. We believe that there are adequate re-

---

1. Plaintiffs' motion for class certification is not addressed in this opinion.

2. The practice or setting loan loss reserves is discussed below.

serves in our loan loss allowance to cover all present and future problems.

Lest investors think Citizens could wind up being victims of the economic downturn, Kelley and Verblaauw also assured investors of Citizens' sound management procedures:

We continue to evaluate our loan portfolio by using early warning signals to classify loans where signs point to deteriorating quality. All classified loans were previously identified, and no additions have been made by regulatory examinations or outside audit reviews. We are following our traditional conservative lending practices to minimize future risk. Almost all of the commercial properties we finance are owner occupied or substantially leased. Residential construction loans to builders are limited to two homes ahead of sale, and borrowers must have a strong net worth.

In the "Management's Discussion and Analysis of Financial Condition and Results of Operations", Citizens again detailed its internal control procedures:

On a monthly basis, management reviews loans delinquent 30 days or more, nonaccrual loans, and other loans identified as needing additional review. In addition, management considers loans identified in the most recent examination by the Comptroller of the Currency and the external auditors. Loans or portions thereof that are determined to be uncollectible are either reserved for or charged off. Loans 90 days past due are placed on a nonaccrual basis unless they are secured and in the process of collection. The evaluation of loans in these categories takes into consideration the risk of the prospective loss presented by such loans and potential sources of repayment, including collateral security. An estimate of losses existing in the portfolio is also made with consideration given to historical data, negative trends in overall delinquencies, concentration of loans by industry, current and anticipated economic conditions that might result in increased delinquencies and new loan types as well as the area served and other relevant factors.... [N]onper-

forming classification does not mean non-earning, but rather, that the probability exists that the interest owed will not be received in full and within the contractual term.

On March 19, 1990, Citizens filed with the SEC, and distributed to shareholders, a Proxy Statement that assured investors that on the recommendation of Citizens' internal Audit Committee, defendant accounting firm Coopers & Lybrand had been retained as independent certified accountants to audit Citizens' 1989 financial statements. In the 10-K form filed with the SEC, and in the Annual Report for 1989, Coopers represented to Citizens' shareholders and the SEC that:

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Citizens First Bancorp, Inc. and Subsidiary at December 31, 1989 and 1988, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 1989, in conformity with generally accepted accounting principles.

On April 16, 1990 Citizens announced that it had achieved a net income of $6,530,-000, or $.30 a share, for the first quarter of 1990. This was down from $9,283,000, or $.43 a share for the similar period in 1989. This decline apparently was due to the fact that Citizens had increased the quarterly

provision for loan losses from $1.65 million to $5 million for the first quarter of 1990, and was planning to make a similar provision for the second quarter. Nevertheless, defendants assured shareholders that the increased provisions reflected Citizens' philosophy of caution, sound management and fiscal conservatism. According to the PR Newswire, "Kelly stated that Citizens is a very conservative institution and has a philosophy of dealing with circumstances before they become a problem. The action taken today is a continuation of this philosophy."

In a Form 10–Q, filed with the SEC on May 14, 1990, Citizens continued to assure investors of the adequacy of its loan loss reserves. Particularly, the Form stated that "the nonperforming classification does not mean nonearning; but rather that the probability exists that the interest owed will not be received within the contractual term.... [A] substantial portion of these [nonperforming] loans are collateralized by real estate, as well as by the personal guarantees of the principals." The Form represented that "in management's opinion, the current provision for loan losses reflects the amount deemed appropriate to produce an allowance for loan losses adequate to meet the present and foreseeable risk characteristics of the loan portfolio."

On July 27, 1990, Citizens disclosed that it would report a loss of $34,488,000, or $1.47 a share, for the second quarter of 1990, due to its increase in loan loss reserves to $70 million. This provision was fourteen times greater than the provision for the first quarter of 1990, and forty-two times greater than the provision for each of the quarters of 1989. Subsequently, a director of Citizens disclosed that $20 million of the $70 million addition to reserves was needed because bank examiners had found that files documenting Citizens' loans lacked current appraisals and financial statements.

Citizens' second quarter 10–Q reported an increase in nonperforming assets from $77,085,000 at the end of 1989 to $192,075,000 at June 30, 1990. For the first time, this 10–Q reflected the classification of non-performing assets, consisting of nonaccrual loans, troubled debt restructuring, and foreclosed real estate. Until this time, Citizens had not included "foreclosed real estate" as an aspect of nonperforming loans and had no classification of "nonperforming assets". Of the increase, $101,602,000 was due to foreclosed real estate, though Citizens stated on the form that foreclosed real estate had been just $713,000 on December 31, 1989.

On August 28, 1990, Citizens reported that Robert Iamuzzo, a Coopers auditor who had acted in a secondary review capacity on Citizens' 1989 audit, was in default to Citizens on a substantial amount in loans issued him by Citizens.

During the time Citizens was portraying itself as a profitable firm, different than the rest, Citizens' common stock reached over $12 per share. On July 18, 1990, the end of the Class period, Citizens stock had fallen by more than 44%, to $7 per share.

On September 6, 1990, plaintiffs filed this complaint, alleging that defendants— consisting of Citizens, Coopers, and several named officers of Citizens and Coopers— intentionally committed a fraud that resulted in the artificial inflation of the price of Citizens' common stock during the Class period.[3] Specifically plaintiffs alleged that the price remained inflated because Citizens failed to provide sufficient reserves to cover loan losses. This failure to provide adequate loan loss reserves allegedly enabled Citizens to represent that its profits were increasing, and hence attract investors. Plaintiffs also contend that Citizens misrepresented the adequacy of its internal control procedures, its lending policy, and the secured nature of nonperforming loans. Plaintiffs further contend that defendant Coopers committed fraud by misrepresenting that its 1989 audit of Citizens complied with generally accepted accounting principles.

---

**3.** Originally, this cause of action involved two complaints. They were consolidated, however, on January 9, 1991.

Count I of plaintiffs' complaint alleges that Citizens and Coopers perpetrated securities fraud, in violation of federal laws. Count II alleges that the individually named defendants are also liable to plaintiffs as "controlling persons" under Section 20(a) of the Securities Exchange Act of 1934.[4] Counts III and IV allege that defendants' actions constituted negligent misrepresentation and fraud under New Jersey common law.

Citizens and its representative named in the suit (the "Citizens defendants") originally moved to dismiss two particular clauses of the complaint, arguing that those clauses alleged unactionable mismanagement rather than fraud. Coopers, though, moved for a complete dismissal of the complaint, for failure to plead fraud with particularity and for alleging mismanagement rather than fraud. In February, 1992, however, Citizens defendant Kelley, later joined by all Citizens and Coopers defendants, made a supplemental motion to dismiss the entire complaint. In this opinion, I address the adequacy of the complaint with respect to all these arguments.

### III. Discussion

Plaintiffs' cause of action involves two separate categories of claims: (1) Securities fraud against Citizens and Coopers, under Section 10(b) of the Exchange Act; and (2) common law claims under New Jersey law. The Citizens defendants contest only the federal claims; Coopers contests both the federal and state claims.

#### A. Federal securities laws

Because the issues raised in this case have been the focus of much discussion in federal courts, a word about the purpose of the securities fraud laws and the courts' interpretations of them is in order.

Under Section 10(b) of the Exchange Act of 1934, and the Securities and Exchange Commission's Rule 10b–5 (the "Exchange Act"), misrepresenting or omitting material information in connection with the purchase or sale of securities is unlawful.

When claiming a violation of these sections, a plaintiff not only has to satisfy Fed. R.Civ.P. 12(b)(6)'s mandate to state a claim upon which relief can be granted, a plaintiff also must satisfy Federal Rule of Civil Procedure 9(b), which provides a minimum standard for pleading fraud. Rule 9(b) states, in relevant part:

> In all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Over the past several years, allegations of securities fraud against financial organizations have increased with the decline in the American economy. As such cases have increased in number, courts across the country have struggled over the correct application of the federal rules on pleading to the Exchange Act. Underlying this problem are two apparently conflicting policies. On the one hand, firms must be protected against claims arising only from hindsight and from a desire to scapegoat certain institutions for the economic downturn of recent years. Describing the complaint in another case, the Seventh Circuit summed up this policy:

> The story in this complaint is familiar in securities litigation. At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud.

*DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990).

But on the other hand, it is increasingly possible for sophisticated companies to shield their fraudulent actions by concealing documents, cleverly wording public releases, and hiding behind the rocks of "puffery" and "ordinary selling". As the Third Circuit has observed:

> Particularly in cases of corporate fraud, plaintiffs cannot be expected to have per-

---

**4.** This claim is not before the court; the moving defendants do not challenge the allegation that the named individuals are controlling members under Section 20(a).

sonal knowledge of the details of corporate internal affairs.

*In re Craftmatic Securities Litigation v. Kraftsow,* 890 F.2d 628, 645 (1989).

For its part, amid several cases, the Third Circuit has tried to strike a balance between the competing policies. It has cautioned that "focusing exclusively on [Rule 9(b)'s] particularity language is 'too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.'" *Seville Industries Machinery v. Southmost Machinery,* 742 F.2d 786, 791 (3rd Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985) (citations omitted). In *Seville industries,* the Court of Appeals further noted that:

> Rule 9(b) requires plaintiffs to plead with particularity the "circumstances" of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior. It is certainly true that allegations of "date, place or time" fulfill these functions, but nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud.

*Seville,* 742 F.2d at 791; accord *Saporito v. Combustion Engineering, Inc.,* 843 F.2d 666, 674 (3rd Cir.1988), *vacated on other grounds,* 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989). The point of this standard is to assure that the allegations are sufficient to put the defendants on notice of the violations that each of them is alleged to have committed.[5]

In a more recent case, however, the Court of Appeals amended somewhat this liberal pleading rule, and held that a plaintiff must show that its case implicates the concern that prior to discovery, the defendants are in a position to cover up fraud. The Third Circuit held in that case that

when pleading fraud, a plaintiff "must accompany such an allegation with a statement of facts upon which their allegation is based." *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 285 (1992). And while this part of the rule is read liberally—for example, plaintiffs complaining against corporate defendants are permitted to make accusations founded only upon information and belief—a complaint "must delineate at least the nature and scope of plaintiffs' effort to obtain, before the filing of the complaint, the information needed to plead with particularity," *Shapiro,* 964 F.2d at 285, and a plaintiff must allege "defendants' exclusive control over the information defendants require." *Shapiro,* 964 F.2d at 284.

Thus, in analyzing any allegation of fraud, a court first must assess whether the claim, if true, would violate the Exchange Act, and, if so, determine, in light of the policies outlined above, whether the claim is pleaded with the requisite particularity under the rule. I will assess the claims against Citizens and Coopers separately.

### 1. Citizens

#### a. Rule 12(b)

■ To state a claim of securities fraud under the Exchange Act, a plaintiff must plead: (1) a false representation of (2) a material, (3) fact; (4) the defendant's knowledge of its falsity and his intention that the plaintiff rely on it; (5) the plaintiff's reasonable reliance on the representation, and (6) the plaintiff's resulting loss. *Lewis v. Chrysler Corp.,* 949 F.2d 644, 649 (3d Cir.1991). Citizens alleges that plaintiffs do not state a claim of fraud under the Exchange act, because the plaintiffs' complaint is based solely on "fraud by hindsight" and its allegations involve only corporate mismanagement and wrongheaded predictions about the future. Plaintiffs respond by claiming that under the law in

---

5. Defendants argue that courts should not let allegations of fraud to be pleaded upon information and belief. The Third Circuit, however, recently contradicted this contention, stating that "where the facts are in the exclusive posses-sion of the adversary, courts should permit the pleader to allege the facts on information and belief, provided a statement of the facts upon which the belief is founded is proferred." *Shapiro,* 964 F.2d at 285.

this Circuit, they have alleged a claim of securities fraud.

■ The essence of plaintiffs' complaint against Citizens is that Citizens and several of its officers deliberately understated loan loss reserves in order to artificially inflate Citizens profits, and hence the price of Citizens stock. Because the complaint focuses on loan loss reserves, I begin the analysis of plaintiffs' complaint with a discussion of the practice of setting loan losses.

A loan loss reserve is a

statement of condition, or balance sheet, account set up by a bank based on its expectations about future loan losses. As losses occur, they are charged against this reserve. That is, the loan account is credited and the reserve account is debited. The reserve is established by a debit to an expense account called the loan loss provision, with a corresponding credit to the loan loss reserve.

*Shapiro,* 964 F.2d at 281 (quoting American Bankers Association, Banking Terminology 215 (1989)). Banks use various methods to evaluate and set loan loss reserves. All methods, however, revolve around specific analyses of the past and present status of loans. Economic judgments made in setting loan loss reserves can be proven right or wrong only at some future date. *Shapiro,* 964 F.2d at 281. Citing C. Edward McConnell, Loan Loss Reserve Management and Unwise Lending Practices, in Bank Credit 354, 354–55 (Herbert V. Prochnow, ed., 1981). The setting of loan loss reserves, however, is intimately related to the bank's analysis of the state of its existing loans, particularly its non-performing loans. And the setting of loan loss reserves, while involving some economic judgment and prediction, may be judged as involving either sound or risky business management judgment.

Plaintiffs allege that Citizens misrepresented the necessary amount of loan loss reserves and did not set loan policy in keeping with its professed management style.

The first question under the standard for stating a claim is whether plaintiffs allege misrepresentations of facts. Many of plaintiffs' allegations clearly involve misrepresentations of fact. These include allegations that Citizens' knew that its set-aside for loan loss reserves were inadequate to cover its expected amount of loan losses; that contrary to Citizens' assertions, a substantial portion of Citizens' non-performing loans were not adequately collateralized and/or guaranteed; and that Citizens knew that the outside accounting firm conducting the 1989 audit of Citizens utilized an auditor with debts outstanding to Citizens.

While these claims clearly allege misrepresentations of fact, alleged misstatements or omissions about loan loss reserves need not be so specific to constitute facts. Rather, in a recent case, the Supreme Court held that a firm's statements of its reasons for actions, opinions or beliefs—such as that a bank's lending practices are "conservative" or that its loan loss reserves are "adequate"—also may be factual. Writing for the Court, Justice Souter said that such statements are "factual in two senses: as statements that the directors do act for the reasons given or hold the belief stated and as statements about the subject matter of the reasons or belief expressed." *Virginia Bankshares, Inc. v. Sandberg,* —— U.S. ——, ——, 111 S.Ct. 2749, 2758, 115 L.Ed.2d 929 (1991).[6] If a defendant financial institution affirmatively characterizes the management practices it utilized to determine the amount of loan loss reserves, "the securities laws are clearly implicated if [defendant] nevertheless intentionally or recklessly omits certain facts contradicting these representations." *Shapiro,* 964 F.2d at 282.

**6.** Although the Supreme Court held only that statements of opinion by *directors* can be material factual statements, the Third Circuit has interpreted this materiality to apply to managers, as well, since "[a] manager's knowledge and expertise regarding the day-to-day operation of his company generally exceeds that of a director, and the reasonable investor is aware of this fact." Shapiro, 964 F.2d at 282.

In this case, plaintiffs allege that defendants represented to its shareholders that it followed the following management practices:

—Citizens identified problem loans and implemented plans to work towards an orderly reduction of debt;

—Citizens was a conservative institution with a philosophy of dealing with circumstances before they became a problem;

—Citizens evaluated the loan portfolio by using early warning signals to classify loans that seemed to be deteriorating;

—Citizens' Audit Committee oversaw the scope, reasonableness and adequacy of its internal accounting controls; oversaw the continuous examination into Citizens' affairs; reviewed and reported the results of internal audits with Citizens' Board of Directors; and reviewed and critiqued all reports from regulatory authorities issued as a result of their examinations of Citizens' activities;

Plaintiffs then allege that defendants intentionally omitted facts contradicting defendants' representations that they used these management practices. The gist of plaintiffs' complaint is that defendants knew that these management practices were not being followed; rather, defendants:

—did not identify each problem loan and act on it;

—did not invest conservatively, and identify problems in advance;

—did not have a tight internal control system that used early warning signals to keep track of loans;

—did not keep track of its internal control system through Citizens' Audit Committee;

With these statements of Citizens' ostensible management and control practices, and plaintiffs' specific allegations that they were not complied with, under *Shapiro* and *Virginia Bankshares*, plaintiffs also have alleged the misrepresentations of facts. Thus, plaintiffs' allegations of misrepresentations or omissions of fact correctly involve actual empirical statements as well as statements of Citizens' internal control procedures and management practices.

■ The next questions are whether such misrepresentations involve *material* facts and whether such facts reasonably were relied upon. In a recent case, the Third Circuit held that:

Materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact. Only if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law.

*Shapiro*, 964 F.2d at 281 n. 11 (citations omitted). In that case, the Court also had occasion to comment on the materiality of misrepresentations or omissions regarding loan loss reserves in particular. The Court of Appeals pointed out that "[t]here is nothing unique about representations and omissions regarding loan loss reserves that removes them from the purview of the antifraud provisions of the federal securities laws." *Shapiro*, 964 F.2d at 281. Rather, "a reasonable investor would be influenced significantly by knowledge that a bank knowingly or recklessly has hidden its true financial status by deliberately misstating its level of non-performing loans, failing to provide adequate reserves, and indulging its problem loan customers." *Shapiro*, 964 F.2d at 281. Thus, misleading or fraudulent statements about loan loss reserves are misrepresentations of material facts reasonably relied upon by potential investors, and "can be the basis for liability under Rule 10b–5." *Id.*, 964 F.2d at 281.

■ The next step in the analysis asks whether plaintiffs have alleged that defendants *knowingly* misrepresented or omitted material facts. In this regard, Rule 9(b) clearly provides that "intent, knowledge, and other conditions of mind of a person may be averred generally." This provision has been applied to allegations

concerning a defendant's state of mind in a fraud claim. *CFTC v. American Metal Exchange*, 693 F.Supp. at 168, 191 (D.N.J. 1988); *Kronfeld v. First Jersey Nat. Bank*, 638 F.Supp. 1454, 1465 (D.N.J.1986). This standard is satisfied where plaintiff "alleges generally that defendants had actual knowledge of the materially false and misleading statements and omissions ... or acted with reckless disregard for the truth." *Kronfeld*, 638 F.Supp. at 1465. Plaintiffs satisfy this test.

■ Finally, the test asks whether plaintiffs have alleged that they suffered harm as a result on reliance on defendants' fraud. Plaintiffs have alleged that they sustained significant losses because of reliance upon Citizens' representations detailed above, and that Citizens intended potential investors to rely on its misrepresentations. Thus, they pass this prong of the test.

Consequently, plaintiffs are permitted to try to prove that defendants knowingly misrepresented the material facts about its internal control and management practices, resulting in both understatements of its loan loss reserves and the artificial inflation of the price of Citizens' stock.[7]

However, "mere failure to provide adequate reserves [however] does not implicate the concerns of the federal securities laws and is not normally actionable." *Id.*, 964 F.2d at 251. Plaintiffs may not, then, attempt to prove that defendants simply failed to provide adequate loan loss reserves. Such allegations involve mismanagement rather than fraud, and are not actionable under the Exchange act. Any allegation of failure to provide adequate loan loss reserves must be tied to an allegation that defendants fraudulently failed to comply with the banking practices they assured investors they were following.

#### b. Rule 9(b)

■ Having determined that plaintiffs have stated a claim of fraud under the Exchange Act, I must determine whether their complaints comply with Federal Rule of Civil Procedure 9(b).

As outlined above, the Third Circuit has adopted a liberal approach to Rule 9(b), tempered by certain specific requirements. Determining the adequacy of plaintiff's fraud complaint involves a three-step analysis: First, do plaintiffs state facts specifically enough? In situations like the instant case, however, the Third Circuit has recognized that specific information necessary to prove fraud may be within the defendant corporation's control. In such circumstances, plaintiffs may satisfy the pleading rule by stating in the complaint: 1) how plaintiffs attempted to gain the necessary information to plead fraud more particularly; and 2) that the defendants have exclusive control over necessary information.

*Specificity of facts*

■ In *Shapiro*, the Third Circuit held that to satisfy Rule 9, a plaintiff "must accompany ... an allegation [of fraud] with a statement of acts upon which their allegation is based." *Shapiro*, 964 at 285. This statement must be read in the context of *Shapiro*'s generally liberal approach to securities fraud cases. In this case, plaintiffs have offered a number of statements of facts upon which their allegations are based. Most importantly, plaintiffs primarily draw the inference of fraud from Citizens' sudden and dramatic escalation of loan loss reserves after repeated assurances that loan policy is under control. In making such allegations, this court has held in a prior case that Rule 9(b) is satisfied when the plaintiff (1) quoted verbatim from the alleged misrepresentations; (2) explained the context in which the representations were made, and (3) described the various defendants involved in the investment program as well as their roles in the

---

7. As a corollary, plaintiffs may also attempt to prove that defendants' misrepresentations resulted in false statements of defendants' profits, and that defendants actions such as purchasing its own common stock because it felt the market was not reflecting the real price of Citizens stock violated its representations of its conservative management practices. As with the loan loss claims, though, plaintiffs may not attempt to prove simply that defendants' projections about the future proved wrong.

scheme.[8] *CFTC v. American Metal Exchange*, 693 F.Supp. 168, 190 (D.N.J.1988).

In this case, the plaintiff has met this burden. First, plaintiff has quoted extensively from alleged misrepresentations made by the defendant, including Annual Reports, press releases, filings with the SEC and press reports. The complaint also explains the context in which the representations were made. The complaint presents the following context, which could lead one to believe that fraud has taken place: Citizens' refusal to expand loan loss reserves, the assurances of the optimistic state of Citizens, the sudden dramatic escalations of loan loss reserves; the assurances about real estate foreclosure that turned out to be false, the assurances about Citizens' conservatism and risk-averse policies that seemed to contradict Citizens' practices. Finally, the complaint describes the various defendants' actions and explains their roles in the allegedly fraudulent scheme.[9]

In other words, plaintiff's allegations, while not brimming with factual detail, are clear and specific enough to permit the defendants to file responsive pleadings, which they in fact did.

Even so, though, I recognize that the allegations in this complaint may not have survived Rule 9(b) scrutiny if the situation did not involve a corporate defendant with probable exclusive control over the necessary material. Thus, I turn to the other prongs of the analysis.

*Plaintiffs' attempt to delineate information*

I find that the complaint satisfies the requirement that plaintiffs detail their efforts to obtain the necessary information to plead with specificity. It is self-evident from the complaint that the plaintiffs reasonably examined the relevant public records. They quote from Securities and Exchange Commission filings, press releases, annual reports, and other communications between the corporation and its shareholders. It is difficult to imagine what more they could have done at this stage in the litigation.

*Plaintiffs' allegation of defendants' exclusive control*

*Shapiro* also stated that a complaint must specifically allege that defendants have exclusive control of information plaintiffs require. *Shapiro*, 964 F.2d at 284. The Third Circuit itself, though, referred to such provisions as "boilerplate," and I find that the nature of the complaint, the situations of the parties make it obvious that only after discovery will plaintiffs have access to information that could truly substantiate their allegations.[10]

---

**8.** Defendants assert in a recent letter to the court that this standard is in conflict with the Third Circuit's recent decision in *Shapiro* because it does not require a plaintiff to plead facts with enough specificity. Defendants misunderstand the mechanics of pleading fraud. This Rule 9(b) inquiry only takes place after the court has determined that the plaintiff alleged the defendants' knowing misrepresentation or omission of a material fact, reasonably relied upon by plaintiffs, that caused plaintiffs harm. The Rule 9(b) specificity requirement requires only that these facts are pleaded with the degree of specificity that enables defendants to respond.

**9.** Specifically, Richard G. Kelley was the Chairman and chief Executive Officer of Citizens. He issued many of the statements representing Citizens' management practices. Rodney T. Verblaauw, President and director of Citizens, also participated in some of Mr. Kelley's statements. Jack M. Blackin was the principle financial officer and principal accounting officer for Citizens, and hence responsible in some way for establishment of loan loss reserves. John J. Cahill, Walter W. Weber, Jr. and Daniel W. Dwyer were directors of Citizens and members of its Audit Committee, which plaintiffs allege intentionally failed to comply with Citizens' alleged stringent internal control procedures.

**10.** Again, defendants argue that *Shapiro* imposes a more stringent standard. And again, defendants mistake the trees for the forest. To dismiss a complaint simply because it did not contain the standard clauses required under Shapiro would be to ignore the thrust of the opinion, which is to provide relaxed pleading requirements. The *Shapiro* Court simply intended to ensure that complaints were made in good faith and after reasonable attempts to plead specifically. If it is clear from the face of the complaint that plaintiffs used available attempts to gain specific information, and if the complaint makes it obvious that the bulk of materials evidencing fraud would be in defendants' hands, the Third Circuit's test is satisfied.

Plaintiffs' complaint, therefore, is written with sufficient particularity to withstand defendants motion to dismiss.

### 2. Coopers & Lybrand Claim

Along with supporting the general arguments above, defendant Coopers & Lybrand (Coopers) also moves to dismiss the complaint specifically against it. It claims that plaintiff's "conclusory allegations" simply do not suffice to state a claim of fraud under Rule 9(b). I disagree.

Plaintiffs make two allegations against Coopers: (1) Coopers engaged in primary fraud; (2) Coopers aided and abetted Citizens in the commission of fraud. I address these in turn.

#### a. Primary Fraud

#### 1. Rule 12(b)

■ As detailed above, a party may allege fraud by establishing (1) a false representation of (2) a material, (3) fact; (4) the defendant's knowledge of its falsity and his intention that the plaintiff rely on it; (5) the plaintiff's reasonable reliance on the representation, and (6) the plaintiff's resulting loss. As detailed above, plaintiffs can meet this burden by alleging a firm's general statements of its management practices and alleging that the firm intentionally failed to comply with these practices. In this case, Coopers' management practices were described in its filing with the Securities and Exchange Commission of 10–K in 1989. In that form, Coopers described the auditing practices it used to assess Citizens' finances. It certified that:

We conducted our audits in accordance with generally accepted auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Citizens First Bancorp, Inc. and Subsidiary at December 31, 1989 and 1988, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 1989, in conformity with generally accepted accounting principles.

Plaintiffs allegations regarding this statement meet the requisite standard:

First, such a statement constitutes representations of Coopers' professional practices, and hence constitute representations of material fact.

Second, plaintiffs allege that the above statement constituted misrepresentation and omission. Specifically, plaintiffs allege that Coopers failed to conform to these representations, in the following manners:

—Generally accepted accounting standards require that the auditor be independent. In fact, a Coopers auditor working in a secondary review capacity had owed outstanding debts to Citizens. It seems that this allegation fuels plaintiffs' contention that the Citizens defendants and Coopers engaged in a joint attempt to fraudulently inflate the price of Citizens' stock.

—Generally accepted accounting standards require that an auditor exercise "due professional care." Plaintiffs allege that Coopers intentionally failed to comply with this standard, by deliberately misleading potential investors into thinking that Citizens' financial state was sound. Specifically, plaintiffs contend that Coopers deliberately overlooked the fact that Citizens' loan files did not contain current appraisals and financial statements, resulting in the understatement of Citizens' loan loss reserves by $20 million.

—Coopers intentionally failed to properly study and evaluate Citizens' internal control system;

—Coopers intentionally did not obtain sufficient competent evidential matter to afford a reasonable basis for its statements about Citizens' 1989 financial statements.

Third, "the alleged misrepresentations or omissions are [not] so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality [and] it is [inappropriate] for the ... court to rule that the allegations are inactionable as a matter of law." *Shapiro,* 964 F.2d at 281 n. 11. Thus, they involve misrepresentation or omission of material facts.

Fourth, just as it is reasonable for a potential investor to rely on a bank's statement of its management practices, it is reasonable for a potential investor to rely on an auditor's statement of its exercise of care and its independence in the performance of an audit.[11]

Fifth, plaintiffs have alleged scienter. As noted above, this requirement is satisfied where plaintiff "alleges generally that defendants had actual knowledge of the materially false and misleading statements and omissions ... or acted with reckless disregard for the truth." *Kronfeld,* 638 F.Supp. at 1465. Plaintiffs have alleged scienter as well as Coopers' intention that potential shareholders rely on their representations.

Finally, plaintiffs have alleged financial loss.

Thus, plaintiffs have alleged a securities fraud case against Coopers.

**2. Rule 9(b)**

■ I now assess whether their pleadings satisfy Rule 9(b). As with Citizens, plaintiffs first must plead facts with sufficient detail. And as with Citizens, plaintiffs satisfy this standard by (1) quoting verbatim from the alleged misrepresentations; (2) explaining the context in which the representations were made, and (3) describing the various defendants involved in the investment program as well as their roles in the scheme.

In this case, plaintiffs meet this standard by quoting Coopers' own language in Citizens' 1989 Annual Report; explaining the context of Coopers sending as one of its auditors of Citizens an individual in default of substantial money to Citizens; and describing this defendant's alleged role in the audit and in the scheme.[12]

*Aiding and Abetting*

■ Defendants next contend that plaintiffs fail to state a claim for aiding and abetting under the securities laws. To establish a securities claim of aiding and abetting, a plaintiff must establish:

(1) an underlying securities violation by a primary actor, (2) the party charged with aiding and abetting knew of the fraudulent conduct, and (3) the party charged substantially participated in the perpetration of the fraud.

*In re Midatlantic Corporation Shareholder Litigation,* 758 F.Supp. 226, 237 (D.N.J. 1990) (citing *Walck v. American Stock Exchange, Inc.,* 687 F.2d 778, 791 (3d Cir. 1982) and *Landy v. FDIC,* 486 F.2d 139, 162–63 (3d Cir.1973)).

**11.** Defendant correctly points out that plaintiffs have not explicitly alleged reliance on Coopers' audit. To grant defendants' motion on this ground, though, would represent pure formalism at the expense of efficiency.

**12.** Coopers argues that plaintiffs fail to meet 9(b)'s particularity requirements in that plaintiffs have not identified which accounting practices were violated, and how these practices were departed from. I disagree.

First of all, it is undisputed that Robert Iamuzzo, a Coopers auditor working in a secondary capacity on Citizens' audit, was indebted to Citizens for millions of dollars. If Coopers knew of this indebtedness, then it clearly did violate the requirement that an auditor be independent. Moreover, once such a suspicious scenario is alleged, it is perfectly reasonable to inquire, through discovery, about the extent of the relationship between Citizens and Coopers, particularly between Citizens and any particular employees of Coopers.

Second, plaintiffs are quite specific in their allegation that by failing to ascertain that Citizens' files lacked current appraisals and financial statements, Coopers intentionally failed to exercise due professional care. More importantly, plaintiffs allege the particular financial statement that was allegedly fraudulently made, and the particular misrepresentation that resulted from this. It is difficult to imagine what more plaintiffs can allege at this stage of the litigation.

As discussed previously, plaintiff has adequately alleged a primary securities fraud violation by Citizens. Thus, the first element is satisfied. The second element refers to the scienter issue. Again, scienter can be pleaded generally, so plaintiffs have satisfied this requirement. The third element is satisfied because plaintiff alleges that Coopers knowingly certified a fraudulent financial statement.

Thus, plaintiffs have stated a claim of securities fraud through aiding and abetting against Coopers.

I now turn to the state law claims.

## C. State Law Claims

The Citizens do not raise any separate arguments for why the state law claims should be dismissed. Coopers, however, does. Since I have determined that the federal claims should not be dismissed, Coopers' argument that there is no pendent jurisdiction over the state claims is simply wrong.

Coopers further argues that plaintiffs' state law claim of fraud should be dismissed for failure to specifically allege reliance on the Coopers audit; and plaintiffs' state law claim of negligent misrepresentation should be dismissed because public investors in the marketplace do not have standing to assert such a claim. I address these in turn.

### 1. Fraud

 Coopers is correct that plaintiffs do not allege specific reliance on the Coopers 1989 annual financial statements which Coopers audited. The whole tenor of the complaint, however, clearly implies that plaintiffs relied on the assurances in the financial statements. While I could dismiss this portion of the complaint without prejudice, it is wasteful and inefficient to engage in that formalistic practice, particularly when plaintiffs have stated that they are willing to amend the complaint to state specific reliance.

### 2. Negligent Misrepresentation

 Coopers finally contends that under *Rosenblum v. Adler*, 93 N.J. 324 (1983), public investors in the marketplace do not have standing to sue under a common law negligent misrepresentation theory.

I disagree. As interpreted by the Third Circuit:

> *Rosenblum* takes an expansive view of the range of permissible plaintiffs in a negligent misrepresentation action. It explicitly rejects the majority view that the plaintiff must be in privity, and adopts the more inclusive "reasonably foreseeable plaintiff" rule.

In the wake of such statements in *Rosenblum*, the Court of Appeals explicitly held that the state court decision did not limit foreseeable plaintiffs to those who invest for a "business purpose."

> There is no dispute here that the average investor was a reasonably foreseeable recipient of defendants' statements.... Moreover, the court looked to the expansive liability under the federal securities laws as a model for New Jersey law ... Therefore, it is not accurate to say that *Rosenblum's* "business purpose" requirement limits the cause of action to those who make "significant" investors.

*Shapiro*, 964 F.2d at 289.

Thus, I decline to dismiss plaintiffs state law complaints on either of the grounds offered by Coopers.

## CONCLUSION

For the reasons detailed above, defendants' motions to dismiss the complaint are denied in their entirety.