**Michael R. GANNON, Plaintiff,**

v.

With regard to Count One through Count Five: CONTINENTAL INSURANCE COMPANY, Continental Corporation, Kenneth B. Ziegler, Individually and as an Agent of Continental Insurance, John P. Mascotte, Individually and as an Agent of Continental Insurance, Steven J. Smith, Individually and as an Agent of Continental Insurance, Adrian M. Tocklin, Individually and as an Agent of Continental Insurance, Marie E. Curatolo, Plan Administrator ERISA Plan and Ann M. Pauker, John and Jane Doe Corporations (1–100), John and Jane Does (1–100); With regard to Count Six Through Count Eighteen: Continental Insurance Company, Continental Corporation, CNA Financial Corporation, Chicago Acquisition Corp., John and Jane Doe Corporations (1–100), John and Jane Does (1–100), (Board of Directors) Ivan A. Burns, Alec Flamm, Irvine O. Hockaday, Jr., John E. Jacob, John P. Mascotte, John F. McGillicuddy, Richard de J. Osborne, Charles A. Parker, John W. Rowe, L. Edwin Smart, Patricia Carry–Stewart, Francis T. Vincent, Jr., Michael Weintraub, Anne Wexler, (Executive Officers) John P. Mascotte, Wayne H. Fisher, Fredric G. Marziano, Charles A. Parker, Steven J. Smith, Adrian M. Tocklin, Bruce M. Brodie, J. Heath Fitzsimmons, James P. Flood, William F. Gleason, Jr., John F. Kirby, Arthur J. O'Connor, Sheldon Rosenberg, Kenneth B. Ziegler, Francis M. Colalucci, William A. Robbie, and KPMG Peat Marwick, Defendants.

Civ. No. 95–2405.

United States District Court,
District of New Jersey.

April 1, 1996.

Law Offices of Linda B. Kenney, Red Bank, N.J. (Linda B. Kenney, of counsel; Gregory S. Schaer, on the brief), for plaintiff.

Cindy Nan Vogelman, Chasan, Leyner, Tarrant & Lamparello, P.C., Secaucus, N.J., and Richard L. Bond, Stewart D. Aaron, Thomas M. Skelton, Dorsey & Whitney P.L.L.P, New York City, for defendants The Continental Corporation; The Continental Insurance Company; CNA Financial Corporation; Bruce M. Brodie; Ivan A. Burns; Patricia Carry–Stewart; Francis M. Colalucci; Maria E. Curatolo, as Plan Administrator, ERISA; Wayne H. Fisher; J. Heath Fitzsimmons; Alec Flamm; James P. Flood; William F. Gleason, Jr.; Irvine O. Hockaday, Jr.; John E. Jacob; John F. Kirby; Frederic G. Marziano; John P. Mascotte; John F. McGillicuddy; Arthur J. O'Conner; Richard de J. Osborne; Charles A. Parker; Ann M. Pauker; William A. Robbie; Sheldon Rosenberg; John W. Rowe; L. Edwin Smart; Steven J. Smith; Adrian M. Tocklin; Francis T. Vincent, Jr.; Michael Weintraub; Anne Wexler; and Kenneth B. Zeigler.

John E. Caruso, C. Alexa Abowitz, Montgomery, McCracken, Walker & Rhoads, Cherry Hill, N.J., for Defendant KPMG Peat Marwick LLP.

*OPINION*

DEBEVOISE, Senior District Judge.

## I. Introduction

Plaintiff in this action, Michael Gannon (sometimes referred to as "Gannon"), is a former employee of Continental Insurance Company ("Continental Insurance") and a former stockholder of Continental Corporation ("Continental Corp."), Continental Insurance's parent company. Gannon's complaint alleges two sets of wrongs arising out of two separate sets of facts. In the first five counts of the complaint Gannon seeks money damages and equitable relief for himself as a former employee of Continental Insurance as remedies for his allegedly wrongful termination on May 20, 1994. In the last thirteen counts of the complaint Gannon sues on behalf of himself and on behalf of a class of stockholders who purchased publicly traded securities of Continental Corp. during a period prior to 1993 and who held such securities at the time of the merger agreement between Continental Corp. and CNA Financial Corporation ("CNA"). As class representative, plaintiff seeks monetary and equitable relief for alleged state common law wrongs, corporate mismanagement and securities fraud perpetrated by the Continental Corp., its officers and board of directors during the year and a half preceding Continental Corp.'s merger with CNA on May 9, 1995.

Named as defendants with respect to Count 1 through 5 are Continental Insurance; Continental Corp.; Kenneth B. Zeigler, Senior Vice President, Human Resources for Continental Corp.; John P. Mascotte, Chairman and Chief Executive Officer of Continental Corp.; Steven J. Smith, Executive Vice President of Continental Corp.; Adrian Tocklin, Executive Vice President of Continental Corp.; Marie E. Curalto, Plan Administrator Erisa Plan; Ann M. Pauker, Plan Administrator The Reduction in Force Plan of the Continental Corp.; John and Jane Doe Corporations (1–100) and John and Jane Does (1–100).

Named as defendants with respect to Counts 6 through 18 are Continental Insurance; Continental Corp.; CNA; Chicago Ac-

quisition Corp.[1]; John and Jane Doe Corporations (1–100); John and Jane Does (1–100); the fourteen individuals constituting the board of directors of Continental Corp.; the sixteen individuals characterized as executive officers of Continental Corp. (two of whom were also director-defendants); and KPMG Peat Marwick ("Peat Marwick"), certified public accountants who were the auditors of Continental Corp. and its subsidiaries during the years pertinent to this litigation.

The Continental defendants (all defendants other than Peat Marwick, Chicago Acquisition Corp., the John and Jane Doe Corporations and the John and Jane Does) moved to dismiss the complaint pursuant to Fed. R.Civ.P. 12(b)(6). After the hearing on the motion and after submission of additional papers by the Continental defendants and plaintiff, Peat Marwick moved for the same relief. For the reasons that follow, the motions to dismiss will be granted with respect to the Plaintiff's federal law claims. Plaintiff's state law claims will be remanded to the state court.

## II. Procedural History

On May 2, 1995 Gannon filed a complaint in the Superior Court of New Jersey. His five count complaint alleged that Gannon had been wrongfully terminated from his position as Vice President of Continental Insurance. On May 9, 1995 Gannon filed a First Amended Complaint which amended the original complaint to assert class action claims against Continental Insurance, Continental Corp. and its executive officers and members of its Board of Directors. The additional counts alleged various forms of corporate mismanagement and violations of federal law.

On May 19, 1995 the action was removed to Federal Court. On August 23, 1995 Gannon filed another complaint, incorrectly captioned as a Third Amended Complaint (since there was no Second Amended Complaint). That complaint added numerous factual allegations, added further allegations of violations of federal law and added other defendants.

On September 29, 1995 the Continental defendants filed their motion to dismiss. At the hearing on the motion I declined the invitation to treat it as one for summary judgement and stated that I would consider only the allegations of the complaint together with documents referred to in the complaint which a court may consider on a Rule 12(b)(6) motion. Because the dates which plaintiff acquired his stock in Continental Corp. were material and were not alleged in the Third Amended Complaint, I asked plaintiff's counsel to file a Fourth Amended Complaint setting forth that information. That has been done, and the factual statement which follows is derived from the Fourth Amended Complaint (hereinafter referred to as the "Complaint") and the documents which may be considered on this motion.

## III. Factual Allegations

The following is an overview of the facts as presented in the Complaint, and is not intended to be comprehensive. Additional facts pertinent to specific claims will be set forth in the appropriate portions of the Discussion below. In addition, although the two sets of charges in the complaint involve facts occurring during roughly the same time period, they involve the plaintiff in different capacities (as employee and as stockholder) and therefore will be recounted separately.

### A. The Termination Issue

At the time of his termination in 1993, Gannon was employed by Continental Insurance in its Cranbury, New Jersey facility as Vice President, NBC/Residual Market Center. (Complaint at ¶ 1) Continental Insurance is in the business of writing property and casualty insurance. (*Id.* at ¶ 2.) Gannon had been employed by Continental Insurance since February of 1969 (*Id.* at ¶ 6.) and is more than forty years old. (*Id.* at ¶ 22.)

In August/September 1993, Gannon was assigned the responsibility of overseeing the Residual Market Center in Glen Falls, New York ("Glen Falls RMC"). (*Id.* at ¶ 14.) Among the people who reported to Gannon at the Glen Falls RMC was Doreen Horvath ("Horvath"), Vice President of the Glen Falls RMC. (*Id.* at ¶ 15.) Upon taking over the Glen Falls RMC Gannon noticed problems

1. Chicago Acquisition Corp. has not been served with process and has been dissolved.

with an underwriting audit for which Horvath was responsible. (*Id.* at ¶ 16.) In addition Gannon was not comfortable with the accuracy of other numbers coming out of Horvath's unit and put pressure on her to improve the quality of her work. (*Id.* at ¶ 17.)

Before taking over Glen Falls RMC Gannon had been warned by Robert Reinke ("Reinke"), Senior Vice President and Horvath's supervisor, to "watch his back" as there was a "special relationship" between Horvath and Frederic Marziano ("Marziano"), President of Continental Insurance. (*Id.* at ¶ 14.) After taking over the Glen Falls RMC Gannon continued to hear rumors about the relationship between Horvath and Marziano. (*Id.*) He heard some cafeteria gossip about Horvath having her hand on Marziano's leg and was told by Glen Tippy ("Tippy"), another Vice President that there were rumors all over Glen Falls that Horvath and Marziano were sleeping together. (*Id.* at ¶ 15.) Gannon also noticed that physically they were closer than most people usually were. (*Id.* at ¶ 14.) Finally, Tippy told Gannon that he had inadvertently glanced in Horvath's date book and discovered that she was having dinner with Marziano. (*Id.* at ¶ 15.)

Gannon believed that Horvath was "going over his head" and dealing directly with Marziano who was not her direct supervisor. (*Id.* at ¶ 14.) Further Gannon believed that the relationship between Marziano and Horvath violated state and federal laws concerning sexual harassment, and that Gannon was being discriminated against based on his gender because he was unable to render favors (based on gender) to Marziano. (*Id.* at ¶ 11.) Gannon also believed that Horvath and Marziano's relationship was negatively affecting the financial results of the corporation. (*Id.*) Finally Gannon believed that Marziano, because of the pressure which Gannon had placed on Horvath, was retaliating against him personally by demoting him and blocking the possibility of his receiving another Vice President position. (*Id.*)

Gannon believed that he was required, by corporate regulation, to report his concerns relating to Horvath and Marziano's relationship. (*Id.* at ¶ 20.) On May 2, 1994 Gannon wrote a personal and confidential letter to John P. Mascotte, Chairman of the Board and Chief Executive Officer of the corporation asking him to investigate the relationship between Marziano and Horvath. (*Id.* at ¶ 10.) Subsequently Gannon met with Mascotte and Steven J. Smith to discuss this issue. (*Id.* at ¶ 18.)

On May 6, 1994, Gannon met with Kenneth B. Zeigler, head of Human Resources, and Mel Katzman, an attorney for the Corporation to further discuss his concerns. (*Id.* at ¶ 19.) On May 16, 1994, Gannon was told by Zeigler and Smith that after an investigation, they were unable to substantiate his concerns. Gannon was also informed that by raising those concerns and causing an investigation, he had committed a terminable offense. (*Id.* at ¶ 20.) Gannon was asked to sign an agreement which offered him three months pay and placement assistance in return for his promise not to sue Continental Insurance. (*Id.*) Gannon was given until May 20th to sign the agreement and was denied an extension to review it with his attorney. (*Id.* at ¶ 21.) Not having signed the agreement Gannon was terminated without any severance pay. (*Id.*)

Gannon, believing that he was in fact entitled to severance benefits, appealed the denial of these benefits. (*Id.* at ¶ 26.) That appeal was subsequently denied by Plan Administrator, Ann M. Pauker, and the Fiduciary of the Plan. (*Id.*)

B. *Corporate Violations and Mismanagement Issues*

Between 1969 and 1994, Gannon purchased stock of the Continental Corp., through the Continental Corp. Incentive Savings Plan whereby money would be deducted from Gannon's salary and used to purchase the corporation's stock on the open market. (*Id.* at ¶ 51.) During the same period Gannon was issued dividends on the stock which he used to purchase additional shares. (*Id.* at ¶ 5(a).) Plaintiff last acquired shares of Continental Corp stock sometime between April 1, 1994 and June 30, 1994. (*Id.* at ¶ 51(e)).

Prior to 1994 Continental Corp. did not set aside reserves for incurred but not reported asbestos-related, other toxic tort, and environmental pollution losses ("Environmental IBNR losses"). (*Id.* at ¶ 66.) Gannon alleges that in 1993 as a result of not setting aside reserves the Continental Corp. showed a profit of 210 million dollars. (*Id.* at ¶ 70.) Based on this profit, the Continental Corp.'s executives were awarded 100% of their variable compensation and substantial bonuses. (*Id.* at ¶ 71.) Gannon alleges that Continental Corp. should have set aside reserves for the Environmental IBNR losses and did not in order that the executives could collect their bonuses, which were based on company profit. (*Id.* at ¶ 86.)

Because of its failure to reserve in 1993, Continental Corp. sustained a loss of $602,-900,000 in 1994. (*Id.* at ¶ 85.) Of that amount 56 million dollars is attributed to Environmental IBNR losses for which Continental Corp. should have reserved in 1993, instead of awarding bonuses. (*Id.* at ¶ 84.) Another factor contributing to Continental Corp.'s loss was the 480 million dollars placed in reserve in 1994, a good portion of which should have been reserved in 1993. (*Id.* at ¶ 85.)

Continental Corp. misled its shareholders regarding this scheme through a series of misstatements in its annual reports and subsequently issued proxy statements.[2] Gannon alleges that these misrepresentations were made by Continental Corp. in an attempt to conceal from the stockholders the true nature of the profit shown in 1993 and the impropriety of the bonuses subsequently taken by management. (*Id.* at ¶ 86.)

On February 10, 1994 the Continental Corp. released and disseminated its Annual Report for 1993 (hereinafter 1993 Annual Report). (*Id.* at ¶ 67.) Discussing Continental Corp.'s reserve policy with respect to Environmental IBNR losses the 1993 Annual Report stated:

Continental does not establish reserves for unreported asbestos-related, other toxic tort and environmental pollution claims because of significant uncertainties, which

do not allow liabilities to be reasonably estimated. Such uncertainties include difficulties in determining the frequency and severity of such potential claims and in predicting the outcome of judicial decisions, as case law evolves regarding liability exposure, insurance coverage and interpretation of policy language. At this time, the future financial impact of unreported asbestos-related, other toxic tort and environmental pollution claims cannot be reasonably estimated, and no assessment can be made with respect to the ultimate impact thereof on Continental's results of operations or financial condition in the future. (1993 Annual Report at p. 17)

In fact these statements are false and Continental Corp. could and should have reserved for such losses. (Complaint at ¶ 67) Contrary to this statement the defendants knew that such losses would be experienced in 1993 and that it was both possible and required for them to set aside the appropriate reserves to cover such losses. (*Id.*)

In addition the 1993 Annual Report concludes with a number of paragraphs lauding the efforts taken by Continental Corp. to ensure the fiscal integrity of the company. (*Id.* at ¶ 95.) The relevant parts provide:

Continental maintains an effective system of internal accounting controls through established policies and procedures including a code of conduct. Such controls are designed to provide reasonable assurance that assets are safeguarded against loss or unauthorized use and that the processes of accumulating and developing financial records are reliable for use in preparing financial statements and maintaining accountability of assets.... The system is continuously reviewed through an extensive program undertaken by a team of internal auditors. (1993 Annual Report at p. 21)

On March 31, 1994 the Continental Corp. issued a proxy statement with respect to its upcoming annual meeting. (Complaint at ¶ 72) Included in this proxy statement was a description of Continental Corp.'s compensa-

---

2. Prior to the 1993 Annual Report no mention was made in the annual report about Continental Corp.'s Environmental IBNR losses reserve policy.

tion policies as well as tables setting forth the compensation awarded to the executives of the corporation in 1993. (*Id.*) Though the proxy statement details the variable compensation and incentive compensation policies, nowhere does it mention that in fact the variable and incentive compensation taken by the executives of Continental Corp. in 1993 was a result of an inflated profit for the year, which occurred primarily because of the failure of the company to set aside the appropriate reserves in 1993. (*Id.* at ¶ 86.)

On May 13, 1994 the Continental Corp. filed a Form S–3 Registration Statement ("Registration Statement") under the 1933 Securities Act which incorporated by reference the 1993 Annual Report and a Quarterly Report for the quarter ending March 31, 1994. (*Id.* at ¶ 104.) In addition to adopting the misstatements contained in those documents the registration statement omitted to state material information, with respect to the scheme perpetrated above. (*Id.* at ¶ 161.)

On December 6, 1994, Continental Corp., CNA and Chicago Acquisition Corporation ("Chicago"), a direct wholly owned subsidiary of CNA formed to facilitate CNA's acquisition of Continental Corp., entered into a merger agreement which provided that CNA through Chicago would acquire Continental Corp. stock at $20 per share. (*Id.* at ¶ 87.) This price was substantially below the market price at the time and in fact was 32.8% below the $29.80 value of the stock in 1993, when Continental Corp. showed a profit. (*Id.* at ¶ 88.)

On March 29, 1995 Continental Corp. issued a Proxy Statement and Annual Report (hereinafter "1994 Annual Report) which among other things asked the stockholders to vote on the proposed merger between CNA and Continental Corp. (*Id.* at ¶ 94.) In addition the 1994 Annual Report discussed Environmental IBNR losses providing:

> Prior to the third quarter of 1994, Continental did not establish reserves for incurred but not reported asbestos-related, toxic tort and environmental pollution claims (the "Environmental IBNR Claims") because the existence of significant uncertainties (including difficulties in determining the frequency and severity of potential claims and in predicting the outcome of judicial decisions, as case law evolves regarding liability exposure, insurance coverage and interpretation of policy language) and the absence of standard techniques to measure exposure did not allow ultimate liabilities to be reasonably estimated in accordance with accepted actuarial standards.

> While Continental continues to believe that it is not possible to reasonably estimate ultimate liability for Environmental IBNR Claims, it has concluded that different measurement techniques based on industry averages, for estimating a reserve for Environmental IBNR Claims have been sufficiently developed, and accepted in the industry, to permit Continental to determine a reasonable gross estimate for Environmental IBNR Claims. (1994 Annual Report at p. F–9.)

On May 8, 1995, one day prior to the voting on the merger agreement, Gannon notified the Continental Corp. of his intent to file suit for fraudulently and purposely keeping reserves low in 1993 in order to show a profit and pay senior executives a bonus and preserve their jobs. (*Id.* at ¶ 91.) On May 9, 1995, the merger between the Continental Corp., CNA and Chicago was approved and has subsequently been completed. (*Id.* at ¶ 80.)

## IV. Discussion

### A. *Motion to Dismiss Pursuant to Rule 12(b)(6)*

■ Pursuant to Rule 12(b)(6), a plaintiff's complaint must be dismissed for failure to state a claim if a defendant demonstrates "beyond a doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Johnsrud v. Carter,* 620 F.2d 29, 33 (3d Cir.1980). All allegations set forth in the complaint must be accepted as true, *see Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081–82, 31 L.Ed.2d 263 (1972), and all reasonable inferences must be drawn in plaintiff's favor. *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991).

On a 12(b)(6) motion, the district court is limited to the facts alleged in the complaint, not those raised for the first time by counsel in its legal memorandum. *Hauptmann v. Wilentz,* 570 F.Supp. 351, 364 (D.N.J.1983), *aff'd without opinion,* 770 F.2d 1070 (3d Cir.1985), *cert. denied,* 474 U.S. 1103, 106 S.Ct. 887, 88 L.Ed.2d 922 (1986); *Seevers v. Arkenberg,* 726 F.Supp. 1159, 1165 (S.D.Ind.1989) ("This court is not at liberty, however, to consider allegations which do not appear in the complaint but which are averred only in legal briefs."). The Court of Appeals for the Third Circuit, however, has held that a "court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss," without converting the motion into a motion for summary judgement, "if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir1993), *cert. denied,* — U.S. ——, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994). This opinion will make reference to documents on which Plaintiff relies relating both to termination issues and the securities issues which were submitted by defendants in support of their motion.

### B. *ERISA-based Termination claim*

The only federal claim which Gannon raises with regard to his wrongful termination is that Continental Insurance violated the Employee Retirement Security Act of 1974 29 U.S.C. § 1001 et seq. ("ERISA") by refusing to provide severance pay.

In Paragraph 26 of the Complaint Gannon alleges:

Continental Insurance, itself, maintains a plan which gives employees benefits if there is a reduction in force or severance. The Plan Administrator at all times relevant herein, was Ann M. Pauker (hereinafter ("Pauker")). Gannon appealed, through appropriate procedures, his denial of ERISA reduction in force/severance benefits. That appeal was denied by Continental, the Plan Administrator and the Fiduciary of the Plan. It should be noted that the Plan is not a separate trust plan, but a plan maintained by the Continental

Corp., of which Continental Insurance is a division.

Gannon's claim to severance pay is based on a portion of the Employee Handbook which provides:

**SEVERANCE**

Severance pay is provided as financial support to assist during the period of unemployment following termination as a result of a reduction in force. Severance is based on salary grade and length of service.

Based on the facts as alleged in the complaint it is clear that defendant was not terminated as a result of a reduction in force. As such he is clearly is not covered by this plan.

Plaintiff argues that though he is not covered explicitly by the severance plan described in the manual he is owed severance pay because it had been the custom of the company to provide severance pay even to employees who were terminated for reasons other then a reduction in force. While Plaintiff might have a contract action against defendant based on this allegation he does not have a claim pursuant to ERISA. 29 U.S.C. § 1102(a)(1) provides: "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." In *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1164 (3rd Cir.1990) the court, relying on this provision, concluded that a written ERISA plan could not be amended by informal communication between the employer and the employee. Rather, all amendments must be in writing to be enforceable under ERISA.

Since the plan as written does not cover Gannon, his ERISA claim asserted in Count 5 must be dismissed.

### C. *Securities Act of 1933*

#### 1. § 11 and § 12(2)

Plaintiff alleges that Continental Corp.'s Registration Statement and Prospectus filed with the SEC on or about May 13, 1994 violated sections 11, 12(2) & 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*, 77*o*, ("1933 Act"), in that they contained misrepresentations of material fact and omitted to

state material facts necessary in order to make statements made not misleading. § 11 provides:

(a) In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security ... may either at law or in equity, in any court of competent jurisdiction sue ...

§ 12(2) provides:

Any person who

(2) offers or sells a security ... by the use of any means of or instruments of transportation or communication in interstate commerce or of the mails by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statement in light of the circumstances under which they were made, not misleading ... shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction to recover the consideration paid for such security with interest thereon less the amount of any income received thereon upon the tender of such security or for damages if he no longer owns the security.

In *Ballay v. Legg Mason Wood Walker Inc.*, 925 F.2d 682 (3d Cir.1991) the court held that § 11 and § 12(2) of the 1933 Securities Act apply only to stocks bought in an initial public offering and not to stocks purchased through secondary market transactions. Further, the Supreme Court in *Gustafson v. Alloyd Co. Inc.*, 513 U.S. ——, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) referring to the *Ballay* case asserted that the word "prospectus" in § 12(2) precludes liability under this section for anything other then a stock purchase on an initial offering.

Among the amendments to the final version of the complaint were allegations setting forth the manner in which and the date when plaintiff acquired his shares. During the period between 1969 and 1994 he purchased stock of Continental Corp. through the corporation's Incentive Savings Plan. Money was deducted from his pay check and used to purchase shares of stock. (Complaint at ¶ 51) Plaintiff made purchases as follows (*Id.* at ¶ 51(a)–(f).):

July 1, 1991—June 30, 1992: He invested $8,629.05 in such stock and received dividends in the amount of $6,609.98 which he used to purchase additional shares of stock.

July 1, 1991—September 30, 1993: He reinvested dividends in the amount of $931.55

August 31, 1993—November 30, 1993: He reinvested dividends in the amount of $1,743.27

January 1, 1994—March 31, 1994: He reinvested dividends in the amount of $1,804.85.

April 1, 1994—June 30, 1994: He reinvested dividends in the amount of $1,738.83.

May 9, 1995 Continental Corp. and CNA merged after which Plaintiff redeemed the 7,289 shares of Continental Corp. stock which he held at that time.

■ There is no allegation that any of these acquisitions were pursuant to an initial offering and plaintiff alleges, in his complaint that he purchased Continental Corp. stock "on the open market". Such a purchase is by definition not pursuant to an initial public offering and as such he has no cause of action under 15 U.S.C. § 77k, or 15 U.S.C. § 77*l*.

2. § 15

15 U.S.C. § 77*o* provides:

Every person who, by or through stock ownership, agency, of otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of

which the liability of the controlled person is alleged to exist.

Since liability under § 15 of the 1933 Act is premised on liability under § 11 or § 12 that allegation fails as well. See *Jenkins v. Fidelity Bank,* 365 F.Supp. 1391 (D.C.Pa.1973) ("Section 15 concerns the liability of 'controlling persons'. The availability of that provision turns upon the presence, inter alia, of liability of a controlled person under Section 11 or 12 of the Act (15 U.S.C. § 77k, 77 *l*".) Consequently Plaintiff's 1933 Act claims will be dismissed.

### D. *The 1934 Securities Exchange Act*

#### 1. *10b–5 Violations*

Gannon alleges that misrepresentations published in Continental Corp.'s Annual Reports and Proxy statements during the "Class Period"[3] violated § 10(b) of the 1934 Securities and Exchange Act 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. ("10b–5 claim").

Count 15, which charges a violation of § 10(b) of the Securities Exchange Act and Rule 10b–5, alleges fraud in general terms. It states that the fraudulent conduct was designed to misrepresent the financial status of the Continental Corp. in 1993 and included making certain statements of material facts and the omission to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading:

such as the issuance of certain statements concerning the [Continental Corp's] ability to reserve for IBNR losses and statements concerning the financial status for 1993, which operated as a fraud and deceit upon plaintiff and the other members of the Class by creating a picture of financial growth and prosperity which was unrealistically favorable for 1993, all of the above

in connection with the purchase of [Continental Corp.'s] publicly traded securities by plaintiff and the other members of the Class. (Complaint at ¶ 170)

These misrepresentations and omissions were contained in proxy statements, annual reports and other documents which misrepresented the financial status of Continental Corp. in 1993 and misrepresented its ability and duty to establish reserves for Environmental IBNR losses. (Complaint at ¶ 172).

Count 15 is directed in general terms to the characterization of Continental Corp.'s financial condition in 1993 and the failure to disclose the effect which Environmental IBNR losses would have on its financial condition. Count 15 does not set forth the specific representations and omissions upon which plaintiff relies. However, it is possible to derive from the "Class Action Allegations" what it is that plaintiff asserts constitutes the misrepresentations and omissions. They are:

1. The annual reports and other publicly filed documents for the years 1990, 1991 and 1992 failed to state that Continental Corp. had a duty to establish Environmental IBNR reserves and failed to state that the corporation had not established reserves for such losses. (Complaint at ¶ 66)

2. These same annual reports "falsely led the shareholders to believe that the Company maintained a system of internal accounting controls designed to provide reasonable assurances that the financial records of [Continental Corp.] were reliable" and "unjustifiably lauded the actions of the independent auditor for [Continental Corp.], KPMG Peat Marwick as well as the Audit Committee of the Board of Director...." (Complaint at ¶ 66(b))

3. The 1993 annual report which was issued on or about February 10, 1994 disclosed that Continental Corp. did not establish En-

---

**3.** The "Class" is defined as, "all persons or entities similarly situated, who purchased publicly traded securities of [Continental Corp.] during the period prior to 1993 and who held such securities at the time of a Merger Agreement ("Merger Agreement") between [Continental Corp.] and CNA and Acquisition which took effect on or about May 9, 1995." The complaint does not define the "Class Period", stating sim-

ply "upon the completion of discovery as to class-related issues, plaintiff will specify the class period more definitely." (Complaint at ¶ 60). Since, therefore, the complaint does not limit the time period of the alleged misrepresentations referred to in Count 15, it is necessary to extract from the complaint and analyze all representations and omissions referred to therein.

vironmental IBNR reserves but contained the following allegedly false and misleading statement:

> Continental does not establish reserves for unreported asbestos-related, other toxic-tort and environmental pollution claims because of significant uncertainties which do not allow liabilities to be reasonably estimated. Such uncertainties include difficulties in determining the frequency and severity of such potential claims and in predicting the outcome of judicial decisions, as case law evolves regarding liability exposure, insurance coverage and interpretation of policy language. At this time, the future financial impact of unreported asbestos related, other toxic tort and environmental pollution claims cannot be reasonably estimated, and no assessment can be made with respect to the ultimate impact thereof on Continental's resultant operations or financial condition in the future.

According to the plaintiff, this statement was false and misleading because the corporation could and should have established Environmental IBNR reserves (Complaint at ¶ 69)

4. The same annual report stated that the profit for the year 1993 was $210,000,000. In view of the fact that Environmental IBNR reserves, which could and should have been established, had not been established, "this image was an utter fabrication." (Complaint at ¶ 70) On the basis of this false and misleading information "the executive directors were awarded bonuses and raises for allegedly good performance of [Continental Corp.] during 1993" and "most of the individual, if not all, executive officers obtained large bonuses and other perks in addition to their indicated salaries totalling well into seven figures or six figures per person per bonus"—further depressing the financial condition of Continental Corp. (Complaint ¶¶ 70, 71)

On December 6, 1994 Continental Corp. and CNA entered into a merger agreement. Continental Corp.'s proxy statements relating to the merger stated that because of large losses it had experienced the common stock of Continental Corp. was to be purchased by CNA at a price of $20 per share—

a discount of 32.8% when compared to the market price of $29.75 as of December 6, 1993 when Continental Corp. was reporting huge profits—profits which were the result of the failure to establish Environmental IBNR reserves. (Complaint at ¶¶ 87, 88)

A reason for the huge decline in the market value of the stock was that in 1994 Continental Corp. sustained a loss of $602,900,000 occasioned in large part by the fact that it established a $480,000,000 reserve for incurred but not reported asbestos-related, other toxic tort and environmental pollution claims. (Complaint ¶¶ 84, 85)

Plaintiff asserts that all the defendants participated in the misrepresentations and omissions and aided and abetted each other in committing securities fraud. (Complaint ¶ 175) Further, plaintiff alleges that "[i]n direct or indirect reliance on the aforesaid false and misleading shareholder reports, releases and financial statements, plaintiff and other members of the Class purchased [Continental Corp.'s] securities during the Class Period and were damaged thereby." (Complaint ¶ 176)

The first two categories of misrepresentation and omission referred to above were added in the most recent amended complaint. They are to the effect that in its 1990, 1991 and 1992 annual reports Continental Corp. did not state that it had not established reserves for Environmental IBNR losses and, it did state that it had an effective accounting system and a praiseworthy independent auditor.

On their face these so-called representations and omissions cannot form the basis of a § 10(b) claim,

■ The 1990 and 1991 annual reports were made public on or about February 13, 1991 and on or about February 13, 1992, respectively. The § 10(b) claims contained in the First Amended Complaint, were filed on May 10, 1995—more than three years after February 12, 1992. A plaintiff must commence a § 10(b) securities fraud claim within one year after he or she discovers the facts forming the basis of the alleged fraudulent misrepresentation and, in any event, within three years of the date when the fraud

occurred. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). The claims based on the 1990 and 1991 annual reports are time barred. It may well be that the claims based upon the 1992 annual report are time barred under the one year limitation period, but it is unnecessary to address that question.

The "omissions" from the 1990, 1991, and 1992 annual reports i.e., failure to state that environmental IBNR reserves were not taken and failure to state that both the auditors and the corporation's audit committee were incompetent are not the kind of omissions or representations that can form the basis for § 10(b) liability.

There is a difference under the securities law between a simple omission and an omission which renders misleading a statement which is made. Here simply an omission is charged. "Silence, about a duty to disclose is not misleading under Rule 10b–5" *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). *See also Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 200 n. 19 (3d Cir.1990) ("Nondisclosure, as opposed to affirmative misrepresentations and misleading half-truths (i.e., failure to disclose sufficient information to render statements actually made not misleading), ordinarily are not actionable under § 12(2) or Rule 10b–5.")

In the present case plaintiff has not alleged any facts which would warrant a departure from this rule, and thus his § 10b–5 claims based upon the 1990, 1991 and 1992 annual reports must be dismissed.

There remain the Section 10b–5 claims which have been at the heart of plaintiff's securities law allegations since he filed his First Amended Complaint. These claims are based on the statement contained in the 1993 Annual Report issued on or about February 10, 1994 to the effect that Continental Corp.

> does not establish reserves for unreported asbestos-related, other toxic tort and environmental pollution claims because of significant uncertainties which do not allow liabilities to be reasonably estimated.... At this time, the future financial impact of unreported asbestos related, other toxic-

tort and environmental pollution claims cannot be reasonably estimated, and no assessment can be made with regard to the ultimate impact thereof on [Continental Corp.'s] resultant operations or financial condition in the future

Plaintiff asserts this statement was false because environmental IBNR losses could have been reasonably estimated; if Continental Corp. had established such losses and taken them the corporation would not have shown a $210,000,000 profit; there would not have been a basis for the enormous compensation benefits paid to its officers; and the market value of the corporation's stock would have been much lower.

In their initial papers in support of their motion to dismiss the Continental defendants urged that plaintiff could not have relied upon the 1993 Annual Report, because he did not allege that he had purchased his shares of stock after February 10, 1994 when the report was made public. It is well established that a plaintiff cannot rely on statements made subsequent to his purchase in order to state a securities fraud claim and that no liability attaches to statements made after the transaction in question, *In re Donald J. Trump,* 793 F.Supp 543 (D.N.J.1992), *aff'd,* 7 F.3d 357 (3d Cir.1993)

In order to give plaintiff an opportunity to meet this point I requested that he file a Fourth Amended Complaint setting forth the dates when he purchased his shares of stock. The Fourth Amended Complaint disclosed that most of his 7,500 shares were purchased prior to February 10, 1994. He cannot establish reliance as to them and does not have a Section 10b–5 claim based on those purchases.

However, the Fourth Amended Complaint reflects that plaintiff reinvested $1,804.85 in the Continental Corp. Stock Fund during the period January 1, 1994 to March 31, 1994, purchasing approximately 80 shares, and that plaintiff reinvested $1,738.83 in the Fund during the period April 1, 1994 to June 30, 1994, purchasing approximately 112 shares. As to these approximately 192 shares there could theoretically be reliance on the 1993 Annual Report issued in February 1994.

Plaintiff's position would have to be that had the reserves been taken in 1993 and had the market price of the stock reflected the reserves he would have paid less for the shares or would not have purchased them at all. Whether, in view of plaintiff's executive position and intimate knowledge of Continental Corp.'s financial condition, such reliance would be reasonable is another question which need not be considered at this time.

15 U.S.C. § 78j provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange— . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5, 17 C.F.R. § 240.10b–5 provides:

It shall be unlawful for any person directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person

■ To prevail on a 10b–5 claim, the plaintiff must establish six elements: "(1) a false representation of (2) a material (3) fact (4) defendant's knowledge of its falsity and his intention that plaintiff rely on it (5) the plaintiff's reasonable reliance thereon and (6) the resultant loss." *Wiley v. Hughes Capital Corp.*, 746 F.Supp. 1264, 1283 (D.N.J.1990).

a. *Materiality*

For a misrepresentation to be actionable it must be material. A company's failure to disclose its corporate mismanagement or breaches of fiduciary duty has been held not to be a material misrepresentation. *See e.g. Biesenbach v. Guenther*, 588 F.2d 400, 402 (3d Cir.1978) ("appellants are stating that the failure to disclose the breach of fiduciary duty is a misrepresentation sufficient to constitute a violation of the Act. We refuse to adopt this approach."); *Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 639 (3rd Cir.1989) ("The line between a material nondisclosure and the nondisclosure of mere mismanagement is often difficult to draw . . . However, courts have been reluctant to permit a federal securities claim to stand when the plaintiff has failed to allege more than nondisclosure of mismanagement.").

■ Gannon's claims are essentially claims of failure to disclose breach of fiduciary duty or corporate mismanagement. He does not allege that the company did not disclose that they were not taking reserves in 1993, because the 1993 Annual Report specifically said "Continental Corp does not establish reserves . . ." Continental Corp., Annual Report at p. 17 (1994) Furthermore, he does not allege that Continental Corp. did not disclose its executive compensation policy, because even he relies on those disclosures. What he alleges is that they did not disclose that the reason they decided not to reserve was because they wanted to take their bonuses. This represents a failure to disclose breach of fiduciary duty and mismanagement and is not actionable under federal securities law. *See also, Stedman v. Storer*, 308 F.Supp. 881, 887 (S.D.N.Y.1969) ("The unclean heart of a director is not actionable, whether or not it is "disclosed," unless the impurities are translated into actionable deeds or omissions both objective and external")

Gannon argues that courts in similar circumstances have held misrepresentations about reserve policies to be material misrepresentations. To support this argument he relies on cases involving banks, which misrepresented their loan loss reserves, and

were found liable for securities violations. *See, e.g. Shapiro v. UJB Financial Corp.,* 964 F.2d 272 (3rd Cir.1992); *Lerch v. Citizens First Bancorp.,* 805 F.Supp. 1142 (D.N.J.1992).

Those cases are distinguishable because the banks not only understated their reserves, they made false affirmative statements as to the quality of their reserve practice. In both cases the courts ruled that it was the misstatements about the quality of the reserve policy and not understating the reserves which were actionable. In *Shapiro* the Third Circuit stated:

> [I]f a defendant has not commented on the nature and quality of the management practices that it has used to reach a particular statement of loan loss reserves, earnings, assets or net worth, it is not a violation of the securities laws to fail to characterize these practices as inadequate, meaningless, out of control, or ineffective. *Id.* at 281.

Similarly in *Lerch,* the court found a bank's misrepresentation about loan loss reserves material because the bank characterized the adequacy of those practices. In reaching this decision the court stated:

> '[M]ere failure to provide adequate reserves [however]' does not implicate the concerns of the federal securities laws and is not normally actionable. Plaintiffs may not then, attempt to prove that defendants simply failed to provide adequate loan loss reserves. Such allegations involve mismanagement rather than fraud and are not actionable under the Exchange act. Any allegation of failure to provide adequate loan loss reserves must be tied to an allegation that defendants fraudulently failed to comply with the banking practices they assured investors they were following. *Id.* at 1152.

Continental Corp. never made any specific characterizations with respect to its reserve policy. The 1993 Annual Report merely stated that it was the corporation's policy not to set aside reserves for Environmental IBNR losses. Since Continental Corp. did not comment on the quality of its reserve policy, but merely described what it was, the representation is not material.

Finally Gannon alleges that the misrepresentations were material because they involved self-dealing by the executives of the corporation. Gannon, bases this allegation on *Bolger v. First State Financial Services,* 759 F.Supp. 182 (D.N.J.1991) in which a court found the failure of a corporation to characterize the compensation of its executive as "gross overcompensation" was not a material misrepresentation. Rather the court said, "it is not necessary to characterize facts in a proxy solicitation if the facts themselves are disclosed." *Id.* at 196. In this case Continental Corp. disclosed that it was not taking reserves and fully disclosed its executive compensation policy. The fact that it failed to characterize that policy is not a material misrepresentation or omission.

### b. *Loss Causation*

■ In order for a 10b–5 claim to be successful a plaintiff must allege loss causation defined as a "causal link between the alleged misrepresentation and the harm incurred when a security is purchased and sold" *Angelastro v. Prudential–Bache Securities, Inc.,* 764 F.2d 939, 944 (3d Cir.), *cert. denied,* 474 U.S. 935, 106 S.Ct. 267, 88 L.Ed.2d 274 (1985). To show loss causation the plaintiff must show "that the fraud caused the decline in value rather than merely inducing the transaction" *Wiley* at 1295.

■ In the present case plaintiff does not allege that the asserted misrepresentations and omissions in the 1993 Annual Report led to his purchase of approximately 192 shares and that but for the misrepresentations and omissions he would not have purchased those shares and would not have suffered the decline in their value after reserves were taken in 1994. Rather he asserts that after the reserves were taken in 1994 and after the bonuses had been paid the value of Continental Corp.'s stock declined so that when a merger agreement was entered into with CNA, CNA agreed to pay only $20 per share—well below the December 1993 market value of $29.75. As a result plaintiff received for his total holding of 7500 shares a $20.00 price instead of a $29.75 price.

It is quite apparent that this loss may represent in whole or in part losses caused by mismanagement or a breach of fiduciary duty. It is not a Section 10b–5 loss.

Gannon alleges that his losses were the result of the defendant's failure to establish reserves in 1993 and the subsequent use of the Company's funds to award the bonuses. Even if the price of Continental Corp.'s stock were affected by the failure to reserve in 1993, the taking of reserves in 1994 would have corrected that defect by 1995 when Gannon's stock was delivered to CNA on the merger. The market value of his stock would have reflected the reserve had the reserves been taken in 1993.

In addition, the allegation that awarding Continental Corp. executives bonuses caused the loss is an allegation of mismanagement, not a failure to disclose. Continental Corp. described its compensation program in detail in its publicly issued material. The actions of the Continental Corp. executives amount to corporate mismanagement and perhaps gave rise to derivative claims. They do not involve disclosure violations under Section 10b–5. Thus for all the reasons set forth above plaintiff's Section 10b–5 claims must be dismissed.

### 2. *Violation of § 14(a) and Rule 14a–9*

In Count 16 Gannon alleges that Continental Corp.'s notice of annual meeting of stockholders and proxy statements dated March 20, 1995 and March 31, 1994 and the Annual Reports for 1993 and 1994 issued to stockholders to solicit proxies for votes at the annual meetings of shareholders held on May 11, 1994 and May 9, 1995 violated § 14 of the Securities Exchange Act, 15 U.S.C. § 78n and Rule 14a–9, 17 C.F.R. § 240.14a–9(a) promulgated pursuant thereto. (hereinafter "§ 14a claim") (Complaint at ¶ 180) The stated purpose of the annual meetings was to approve the merger of Continental Corp. and CNA and to elect thirteen directors (Complaint at ¶ 181).

As will be described in more detail below, Count 16 does not allege specific misrepresentations as such. Rather it recounts "the utter failure of the individual defendants to fulfill their stewardship responsibilities as specified herein, and their operation of [Continental Corp.] in such a way that they recklessly engaged in improper and fraudulent activities and wasted the shareholders' assets as particularized above." (Complaint, at ¶ 182). The failure to recite the instances of alleged mismanagement constitutes the alleged omission. Inclusion of earnings and other financial figures without discounting them to reflect the results of mismanagement constitutes the misrepresentations.

§ 14(a) provides:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentalities of interstate commerce or any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security registered pursuant to section 78l of this title)

Rule 14a–9(a) provides:

No solicitation subject to this regulation shall be made by means of any proxy statement, form or proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading in or necessary to correct any statement in any earlier communication with respect to other solicitation of a proxy for the same meeting or subject matter which has become false or misleading

A successful 14(a) claim must alleged "that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was 'an essential link in the accomplishment of the transaction'" *General Elec. Co. by Levit v. Cathcart*, 980 F.2d 927, 932 (3d

Cir.1992) (quoting *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 385, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970)).

### a. *Materiality*

Count 16 alleges two kinds of mismanagement—i) the failure to take Environmental IBNR reserves and ii) a laundry list of items which plaintiff asserts represent mismanagement and/or breach of fiduciary duties.

The failure to take Environmental IBNR reserves is discussed above as it relates to the charge of securities fraud. Continental Corp.'s 1993 Annual Report (dated February 10, 1994) stated that the corporation did not "establish reserves for unreported asbestos-related, other toxic tort and environmental pollution claims." The reason given for this failure was that significant uncertainties did not allow such liabilities to be reasonably estimated. According to plaintiff, defendant's motive in not reporting the reserves was to enable executives to take large bonuses based on earnings.

The annual report baldly stated that Environmental IBNR reserves were not taken. The complaint itself characterized this failure as mismanagement:

> As a direct result of the mismanagement by failing to establish reserves for IBNR environmental claims the net income for [Continental Corp.] during 1993 was artificially inflated and was utilized to award executives within the Company large and excessive bonuses based on the false representations of the Company's performance in 1993. (Complaint at ¶ 120)

■ Mere failure to take loss reserves (and the resulting "inflation" of income) does not support a § 14(a) claim. To support such a claim there must have been an affirmative misrepresentation. In *DiLeo v. Ernst & Young,* 901 F.2d 624, 627–28 (7th Cir.), *cert denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990), the court rejected investors' claim based upon the mere fact that the company drastically increased loan reserves from earlier estimates, stating "You cannot tell from reading [the complaint] why the [plaintiffs] believe that the problems were so apparent that reserves should have been jacked up before the end of 1983—why failure to increase the reserves amounted to fraud."

The cases upon which plaintiff relies illustrate the distinction between an unconcealed failure to take reserves for losses and misrepresentations about reserves.

In *Lerch v. Citizens First Bancorp.,* 805 F.Supp. 1142 (D.N.J.1992), plaintiff charged that the bank disclosed in several filings that it had established loan loss reserves in a specific dollar amount sufficient to cover any non-performing real estate loans, when in fact it knew that such reserves would be insufficient to cover its bad loans. *See id.* at 1145–47. The plaintiffs alleged that management characterized its approach with respect to reserving practices as reflecting the bank's "philosophy of caution, sound management and fiscal conservatism." *Id.* at 1147.

The court in *Lerch* found that the plaintiffs had stated a securities law claim by virtue of the alleged misrepresentations that the loan reserves were sufficient to cover non-performing loans, and by virtue of management's alleged mischaracterization of its reserving practices as fiscally conservative *Id.* at 1150–52. In discussing the difference between securities fraud and corporate mismanagement with respect to the setting of loss reserves, the court explained:

> '[M]ere failure to provide adequate reserves [however] does not implicate the concerns of the federal securities laws and is not normally actionable.' Plaintiffs may not, then, attempt to prove that defendants simply failed to provide adequate loan loss reserves. Such allegations involve mismanagement rather than fraud and are not actionable under the Exchange Act. Any allegation of failure to provide adequate loan loss reserves must be tied to an allegation that defendants fraudulently failed to comply with the banking practices they assured investors they were following. *Id.* at 1152 (citation omitted)

Similarly in *Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 281 (3d Cir.1992), the Court of Appeals held that the mere failure to provide adequate loss reserves is not ordinarily actionable under the securities laws absent a misrepresentation by management

as to the adequacy of such reserves to cover loan losses.

> [I]f a defendant has not commented on the nature and quality of the management practices that it has used to reach a particular statement of loan loss reserves, earnings, assets or net worth, it is not a violation of the securities laws to fail to characterize these practices as inadequate, meaningless, out of control or ineffective.

In the present case plaintiff does not allege that Continental Corp. misrepresented the amount or the adequacy of the reserves nor characterized its reserve policies as "conservative" or "cautious." Plaintiff alleges simply that Continental Corp. stated (accurately) that it did not take Environmental IBNR reserves in 1994 and that it should have taken such reserves. Plaintiff charges that the motive for not taking such reserves was improper. That may well be a ground for a claim based upon mismanagement, but it is not a basis for a § 14(a) claim

■ The other kind of non-disclosure upon which plaintiff bases his § 14(a) claim is a series of alleged acts of mismanagement. Plaintiff charges that Continental Corp. failed to disclose on its proxy materials: (Complaint at ¶ 183).

i) "The utter failure of the individual defendants to fulfill their stewardship responsibilities ..."

ii) "there were numerous failures in the audit process relating to the accounting for reporting of [Continental Corp.'s] financial condition during 1993 ..." (Complaint at ¶ 184(a))

iii) "the members of the Audit Committee did not consider, in light of these failures, alternative auditors to serve in 1994." (Complaint ¶ 184(b))

iv) "the relationship between [Continental Corp.'s] auditors and senior management had grown incestuous over the years and that, as such, KPMG auditors were inclined to and did accede to management decision not to establish reserves for IBNR environmental claims." (Complaint ¶ 184(c)).

v) "KPMG had a long history of questionable 'audits' of corporate entities and financial institutions, many of which 'audits' preceded collapses of the companies in question or massive and previously unexpected write-offs of assets and regulatory take-overs". (Complaint at ¶ 184(e)).

These allegations, like those with respect to failure to take Environmental IBNR loss reserves are charges of mismanagement and do not provide a basis for a § 14(a) claim.

The allegations against Peat Marwick are virtually identical to those which were the subject of *Ciresi v. Citicorp,* 782 F.Supp. 819 (S.D.N.Y.1991), *aff'd,* 956 F.2d 1161 (2d Cir. 1992). The district court dismissed the complaint holding that "[d]isclosure of unproven allegations of this nature is not required in proxy information, ... and an action under § 14(a) is not the proper avenue for a shareholder to challenge the Board of Directors' selection of an accountant." *Id.* at 823. Since Gannon fails to allege nondisclosure of material facts his 14(a) claim must be dismissed.

#### b. *Transactional Causation*

The complaint alleges that notices of annual meetings of stockholders and the proxy statements were disseminated to the shareholders to solicit proxies to vote at the May 11, 1994 and May 9, 1995 annual meetings of stockholders (Complaint ¶ 180). Among the purposes of the annual meetings were approval of the agreement of merger with CNA and the election of directors. (Complaint, ¶ 181).

■ In *General Electric Company v. Cathcart,* 980 F.2d 927 (3d Cir.1992) the Court of Appeals considered the transaction causation requirement of a § 14(a) claim. A plaintiff must show that the proxy solicitation was an essential link in the accomplishment of the challenged transaction. In *Cathcart* the plaintiff had argued that "the misleading proxy statements served as an essential link in the transaction which caused General Electric to lose money, the proxy statements allowed the appellees to retain their positions on the board, thus insuring that they could continue to mismanage the company." 980 F.2d at 933.

Affirming dismissal of a Section 14(a) claim, the Court of Appeals held that such allegations are not sufficient to state a Section 14(a) claim:

> [T]his is precisely the sort of claim that courts have repeatedly found insufficient to satisfy the transaction causation requirement. The pecuniary harm to General Electric that Levitt alleges resulted from the appellees' purported mismanagement. Yet the mere fact that omissions in proxy materials, by permitting directors to win reelection, *indirectly* lead to financial loss through mismanagement will not create a sufficient nexus with the alleged monetary loss. Rather, damages are recoverable under Section 14(a) only when the votes for a specific corporate transaction requiring shareholder authorization, such as a corporate merger, are obtained by a false proxy statement, and that transaction was the direct cause of the pecuniary injury for which recovery is sought. Thus, the appellees' reelection as directors did not create any cognizable harm because the shareholders' vote did not authorize the transactions that caused the harm. *Id.*

As to the merger, plaintiff does not contend that the merger itself was wrongful; he simply alleges that mismanagement by the board of directors and officers prior to the merger reduced the value of Continental Corp. stock and that as a result the price which shareholders received on the merger was less than it could have been had there been no mismanagement. The proxy solicitations were not an essential link in the incurring of these losses. The complaint's allegations do not meet the transaction causation requirement of a § 14(a) claim.

Since the complaint meets neither the materiality nor the transaction causation requirements of a § 14(a) claim Count 16 must be dismissed.

## E. *RICO*

Count 17 charges violation of the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1962(b) and (c). Count 18 charges a RICO conspiracy, 18 U.S.C. § 1962(d), i.e., a conspiracy to commit acts in violation of § 1962(b) and (c).

Section 1962(b) prohibits any person from acquiring, maintaining an interest in, or controlling any enterprise engaged in interstate commerce through a pattern of racketeering activity. Section 1962(c) prohibits any person employed by or associated with an enterprise in interstate commerce from conducting or participating in the affairs of the enterprise through a pattern of racketeering activity. Section 1962(d) prohibits any person from conspiring to violate subsection (a), (b), or (c) of § 1962.

The complaint alleges that all of the defendants were the RICO persons who conducted and participated in the conduct of Continental Corp.'s affairs through a pattern of racketeering activity.

The complaint is generous in its "enterprise" allegations, claiming the existence of no less than six different enterprises each engaged in interstate commerce: (i) Continental Insurance, (ii) Continental Corp., (iii) Continental Insurance, Continental Corp., CNA, and Chicago Acquisition Corp., (iv) defendants Zeigler, Mascotte, Smith, Tocklin, Curatolo and Pauker, (v) the defendant directors of Continental Corp., and (vi) the defendant executive officers of Continental Corp.[4]

The predicate acts alleged in Counts 17 and 18 are found in the fraudulent sale of securities and mail fraud. The securities fraud consisted of the conduct described earlier in this opinion, i.e., the failure to include in the 1993 annual report issued in February, 1994 Environmental IBNR loss reserves, the resulting inflated income for 1993 and the awarding of bonuses based on that income. The mail fraud consisted of mailing on more than two occasions proxy statements and annual reports in furtherance of the scheme to defraud stockholders.

---

4. It is readily apparent that the fact that the alleged RICO persons are the same as certain of the alleged RICO enterprises creates some problems. *Jaguar Cars Inc., v. Royal Oaks Motor Car Company,* 46 F.3d 258 (3d Cir.1995). However since the RICO counts are defective for other reasons it is unnecessary to unravel the person-enterprise congruence.

As discussed above, the complaint fails to allege securities fraud, and thus securities fraud cannot be considered to be a RICO predicate act. This opinion has not addressed the question whether the complaint adequately alleges some other species of fraud which, if the mails were used, would support a federal mail fraud charge. However, even if securities fraud were properly alleged, and even if some other basis for a mail fraud offence existed, the RICO counts are defective because they do not allege "a pattern of racketeering activity"—a requirement of a claim under each of the RICO sections upon which plaintiff relies.

In *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) the Supreme Court addressed the concept of "pattern" in civil RICO. The Court rejected the concept that the statute is to be used only against mobsters and organized criminals, as distinguished from legitimate enterprises. However, the *Sedima* opinion suggested that the breadth of predicate offenses might be narrowed were Congress and the courts to develop a meaningful concept of "pattern."

In *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) the Court examined the RICO statute and its legislative history in an attempt to determine the confines of a "pattern of racketeering activity." Based on that review the Court concluded that "to prove a pattern of racketeering activity a plaintiff must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Id.* at 239, 109 S.Ct. at 2900.

Predicate acts are related if they "have the same or similar purposes, results, participants, victims or method of commission or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. at 2901.

As to continuity, "[w]hat a plaintiff or prosecutor must prove is continuity of racketeering activity or its threat, *simpliciter.*" *Id.* at 241, 109 S.Ct. at 2902. The Court described continuity as "both a closed- and open-ended concept, referring either to a closed period of repeated conduct or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* A party may establish continuity as a closed ended concept by "proving a series of related predicates extending over a substantial period of time." *Id.* at 242, 109 S.Ct. at 2902.

After the Supreme Court decided *Sedima,* but before the decision in *H.J. Inc.,* the Court of Appeals for the Third Circuit rejected a district court ruling that to establish a pattern a plaintiff had to show two or more unlawful schemes, as distinguished from two or more unlawful acts, such as mailings when mail fraud was the predicate act. Instead, the court set forth six factors to be considered when determining whether a pattern of racketeering has been established in a given case: i) the number of unlawful acts, ii) the length of time over which the acts were committed, (iii) the similarity of the acts, iv) the number of victims, v) the number of perpetrators, and vi) the character of the unlawful activity *Barticheck v. Fidelity Union Bank/First Nat'l State,* 832 F.2d 36, 39 (3d Cir.1987). Following the Supreme Court's decision in *H.J. Inc.* the Third Circuit Court of Appeals has decided a number of cases dealing with RICO's continuity requirement. In *Kehr Packages, Inc. v. Fidelcor Inc.,* 926 F.2d 1406 (3d Cir.1991) the court found an eight month scheme involving mail fraud to be insufficient to establish a pattern of racketeering activity. The court held that "in determining the duration of a scheme involving mail fraud, the relevant criminal conduct is the defendant's deceptive or fraudulent activity, rather than otherwise innocent mailings that may continue for a long period of time." *Id.* at 1418. In *Hindes v. Castle,* 937 F.2d 868, 873 (3d Cir.1991) the court found that "duration is the *sine qua non* of continuity." In *Hughes v. Consol-Pennsylvania Coal Co.,* 945 F.2d 594, 610–11 (3d Cir.1991) the court noted that in other circuits a period of years is necessary to maintain a finding of closed period continuity and held that a scheme lasting for twelve months is not long enough to establish a closed period pattern of racketeering activity as "there is no qualitative difference between eight and twelve months for the purposes of RICO continuity".

The court in *Swistock v. Jones* 884 F.2d 755 (3d Cir.1989) found racketeering offenses spanning fourteen months to satisfy the continuity requirement. However, the court also noted allegations in the complaint extending to another year and an allegation that this activity was part of the defendant's way of conducting his business. The court therefore found that Plaintiff had established an open ended period sufficient to satisfy RICO's continuity requirement.

*Tabas v. Tabas,* 47 F.3d 1280, 1293 (3d Cir.1995), is the Court of Appeals most recent definitive opinion on the subject of pattern of racketeering activity. It leaves in some doubt the extent to which the *Barticheck* factors are to be considered in determining whether a pattern has been pled.

 Applying *Sedima, H.J. Inc.,* and *Tabas,* it is apparent that plaintiff's pleadings negate the existence of either closed-ended or open-ended conduct constituting a pattern. Basically plaintiff alleges a single action—payment of incentive bonuses made possible by inflated income resulting from failure to take Environmental IBNR loss reserves in 1993.

According to the complaint, in February 1994 Continental Corp. issued its annual report stating that it had not taken Environmental IBNR loss reserves and that its profits for 1993 were $210,000,000 (Complaint ¶¶ 67 and 68). In a March 31, 1994 proxy statement Continental Corp. set forth the compensation attributable to 1993 operations received by its executives, including the variable compensation based upon achievement of specific performance objectives (Complaint ¶¶ 73–81). The bonuses were payable in the Spring of 1994 (Complaint ¶ 106). In the fall of 1994 Continental Corp. did what plaintiff alleged it should have done in 1993—it set aside a $480,000,000 Environmental IBNR loss reserve. On December 6, 1994 Continental Corp and CNA entered into a merger agreement (Complaint ¶ 87). A March 29, 1995 proxy statement described Continental Corp.'s operations for 1994, disclosing a loss of $602,900,000, occasioned in part by the $480,000,000 reserve (Complaint ¶¶ 84 and 85).

None of these actions by itself constituted a predicate act unless the 1993 Annual Report were deemed to be false and misleading so as to constitute securities fraud. If so, that was a single act. It was not a series of related predicates over a substantial period of time as required by *H.J. Inc.*

Even if there were some other species of fraud alleged in the complaint which use of the mails would convert into mail fraud offenses, plaintiff has failed to allege a closed-ended period. The essential fraud could only have been inflating earnings to justify achievement based compensation of executives. The longest period during which this fraud could have taken place under the allegations of the complaint was from February 10, 1994 when the 1994 Annual Report was issued until March 29, 1995 when a proxy statement was issued disclosing that Environmental IBNR reserves had been taken for 1994.

Assuming that numerous mailings had been made during that period which somehow were actionable as part of the fraud, the period itself is too short to support a closed-ended pattern. More fundamental however, is the fact that where mail fraud is charged as the predicate acts, to determine continuity a court must look to the underlying scheme rather than to the individual acts of mailing. As stated in *Tabas:*

> In evaluating the present case in accord with this precedent, we will first consider whether closed ended continuity has been established. At the outset, we note that in civil RICO complaints based on predicate acts of mail fraud 'the continuity test required us to look beyond the mailings and examine the underlying scheme or artifice. Instances of deceit constituting the underlying fraudulent scheme are more relevant to continuity analysis' *Kehr Packages* 926 F.2d at 1414. Consequently, in determining whether or not continuity has been established in the present case, we must focus on the duration of the underlying scheme. Just as the mailings are an element of the federal offense of mail fraud, so too is the scheme or artifice to defraud. 47 F.3d at 1294 (footnote omitted).

In *Tabas,* plaintiff charged that for more than three and a half years defendants had engaged in a continuing series of thefts from an estate. The thefts, were the underlying scheme, the critical acts in the continuity analysis—not the multitude of mailings which took place during that period and which were the predicate acts.

In the present case the underlying scheme (if scheme it be) was the failure to take Environmental IBNR reserves for 1993 as disclosed in the 1993 Annual Report issued in February 1994 and payment of the augmented compensations in the spring of 1994. Under *Tabas* a court must look to that conduct rather than to the multitude of mailings which might be deemed predicate acts. The alleged scheme was short lived, requiring only several months to execute. It cannot be considered a closed-ended pattern of racketeering activity.

The complaint clearly does not allege an open-ended scheme. The 1993 Annual Report was issued on February 10, 1994 and the enhanced compensation was paid in the spring of that year. If that constituted fraud it ended at that time. There is no suggestion that defendants are continuing the tactics by which it is alleged they positioned the officers for extra compensation. In fact, the complaint alleges that Environmental IBNR reserves were taken in the fall of 1994 as reported in a March 1995 proxy statement.

The Court of Appeals did not employ the six *Barticheck* factors in its analysis in *Tabas,* but the majority opinion stated that these factors might be relevant in a different case in determining if continuity exists. In particular "in those cases where relatedness and continuity are in doubt, other factors should be examined to discern if there is a 'pattern of racketeering activity' under RICO." 47 F.3d at 1296.

In the present case there is little doubt that continuity is lacking. This conclusion is confirmed by consideration of the *Barticheck* factors. The first factor, the number of unlawful acts, was discussed above. The instances of deceit, rather than the number of mailings, is the critical factor.

The second factor is duration. That has been discussed above; whether we consider the period of possible mailings from February 10, 1994 to March 29, 1995 or whether we consider the February 10, 1994 to Spring 1994 period during which the alleged scheme took place, it is too short to provide the continuity required of a pattern.

The third factor is the similarity of the alleged criminal acts. If the underlying scheme is considered there was only one alleged scheme and nothing to compare it with. If the mailings are considered, they are certainly similar to each other to the extent that they relate to the same underlying scheme. This factor does not appear to weigh heavily in deciding if there was a pattern of racketeering activity. Under *H.J. Inc.* a pattern requires relationship *and* continuity.

As to the fourth factor, the number of victims, it would appear that the victim of the alleged excessive compensation scheme was the corporation. Its shareholders were affected only indirectly *c.f. Kehr Packages v. Fidelcor, Inc.,* 926 F.2d 1406 (3d Cir.1991). This weighs against a finding of continuity.

The fifth factor is the number of perpetrators. The complaint alleges a host of participants in the alleged scheme to provide the executive officers with excessive compensation by failing to take Environmental IBNR reserves in 1993—the two Continental Corporations, the members of the board of directors, the executive officers, Peat Marwick, CNA, Chicago Acquisition Corp., up to 100 John and Jane Doe Corporations and up to 100 John and Jane Does are named as defendants with regard to Counts 1 through 5. The allegations contained in those counts fill in the details of the more generalized allegations of the two RICO counts. Often a large number of participants in a crime is suggestive of an organized criminal venture of the nature RICO was intended to cover. This factor alone does not provide continuity to a short term criminal offense. Here the array of alleged participants is not suggestive of an organized criminal venture. Just a single participant militates against a finding of organized crime, at the other extreme a vast multitude of participants may have the same effect.

The final *Barticheck* factor, the character of the alleged unlawful activity, is useful in determining whether an alleged offense is of the kind to which RICO is directed or is a garden-variety claim of fraud which Congress did not intend to bring within RICO's reach. Here the alleged scheme itself is a delay in taking reserves so as to enable corporate executives to qualify for extra compensation for the year 1993. The predicate acts are mailings. As one court has stated, "[r]epeated mailings in furtherance of a single scheme to inflict one fraudulent injury may be no indication of the underlying fraud's continuity." *Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1295 (7th Cir.1992).

Thus to the extent that the six *Barticheck* factors are pertinent they point to a conclusion that the complaint does not allege a pattern of racketeering.

In sum, the complaint fails to adequately allege the predicate act of securities fraud. Even if it did adequately allege facts constituting securities fraud and/or mail fraud, its allegations are such as to negate the existence of a pattern of racketeering activity, an essential element of the Count 17 and Count 18 RICO claims. Therefore those counts must be dismissed.

### F. Peat Marwick's Motion

Peat Marwick moved to dismiss the federal claims on the merits and the state law claims pursuant to 28 U.S.C. § 1367(c).

Peat Marwick urges that the federal securities claims are barred by the statute of limitations. It contends that the § 1962(c) RICO claim is barred by the principles announced in *Reves v. Ernst & Young,* 507 U.S. 170, 170–172, 113 S.Ct. 1163, 1166, 122 L.Ed.2d 525 (1993) and applied in *University of Md. v. Peat, Marwick, Main & Co.,* 996 F.2d 1534 (3d Cir.1993). Peat Marwick contends that the § 1962(b) RICO claim is defective in that it fails to show injury from its alleged acquisition or control of an interest in a RICO enterprise in addition to injury from the predicate acts, *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153 (3d Cir.1993). Further, Peat Marwick argues, the complaint is legally insufficient under § 1962(b) because applying *Reves* it does not and cannot allege that Peat Marwick acting as independent auditors acquired an interest in or controlled the enterprise. Finally, Peat Marwick urges that since the substantive claims are deficient any claim under § 1962(d) based on a conspiracy to violate the other subsections of § 1962 must fail.

It is unnecessary, however, to address the defenses to the federal claims which are peculiar to Peat Marwick because all the federal claims must be dismissed as to all the defendants for the reasons set forth in the preceding sections of this opinion.

Peat Marwick has advanced a number of defenses to certain of the state law claims. However, for the reasons set forth below these are issues which had best be decided by the state courts.

### V. *Conclusion*

The forgoing sections of this opinion require the dismissal of all federal claims, namely: Count 5 (ERISA), Count 14 (violation of §§ 11, 12(2) and 15 of the federal Securities Act), Count 15 (violation of § 10(b) of the Securities Exchanges Act and Rule 10b–5), Count 16 (violation of § 14(a) of the Securities Exchange Act and Rule 14a–9), Count 17 (violations of RICO § 1962(b) and (c)) and Count 18 (violation of RICO § 1962(d)).[5]

The remaining counts, namely 1 through 4 and 6 through 13, assert state law claims. The Continental Defendants have moved to dismiss those claims on the merits. Peat Marwick urges that the court not exercise jurisdiction over the state law claims and moves for their dismissal pursuant to 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187 (3d Cir.1976).

---

**5.** Although Count 4 refers to Title VII of the Civil Rights Act of 1964 and the federal Older Workers Benefit Protection Act, plaintiff has not asserted claims under those Acts and refers to them as support for his Count 4 claim that his termination violated the public policy of the State of New Jersey.

It would be inappropriate for a federal court to resolve the many questions of state law which the complaint raises in absence of any related federal claims. Plaintiff instituted the case in the state courts, and the Continental Defendants removed it to federal court. The proper disposition is not to dismiss the state law claims. Rather those claims will be remanded to the state court pursuant to 28 U.S.C. § 1441(c).

I shall file an appropriate order.